IDA WENDLING et al. v. RICHARD BOWDEN et al., Appellants.

### Division One, December 6, 1913.

1. **WILL CONTEST: Undue Influence: Confidential Relation: Burden of Proof.** Where the principal beneficiary of his father's will was a mature man and for several years prior to his death he lived in his father's house with his aged and infirm father and mother, attended them constantly and especially during their last sickness, and had charge of and transacted practically all of his father's business, the burden of proof rests upon him and the other proponents to establish that the will was not the result of undue influence exercised by him over the mind of the testator; for those facts constitute a relationship from which the law draws the inference or presumption that the will was produced by the undue influence of that beneficiary and agent.

2. ———: ———: ———: **Inequality.** Equality among testator's children is ordinarily equity; and where the contrary appears, the just mind naturally asks for the reason thereof. And when that equality of affection for his children was often expressed and seemed to be the set purpose of testator for years, and afterwards when testator had grown old and infirm one of his sons moved into his house and thereafter transacted his business and after four years of such relationship testator made his will practically disinheriting his other children, hav-

ing in the meantime become alienated from them, the will bespeaks an unnatural disposition of testator's property, and the burden rests upon the principal beneficiary to show that it was not the result of undue influence.

3. ———: ———: ———: This Case. Testator was a man of strong will and set purpose, and had been a successful farmer. He had four children, three sons and a daughter. . He gave each of the two older sons (Richard and Samuel) eighty acres of land adjoining the home place, and in a short time thereafter each married and moved upon the land so given him. The daughter married and thereafter lived with her husband three or four miles away. Her marriage was not altogether pleasing to testator, but there was no rupture. The younger son (Henry) remained at home and farmed for an interest in the crops, using his father's teams and implements. His mother was old, and he was kind to her, often doing the housework, and combing her hair. He married and brought his wife home, and his father seemed to think as much of her as if she were his own daughter. His father gave him a colt, a cow and calf, a steer and heifer, and, by trading and care, these had increased in three or four years to fifteen or sixteen head. He was a good worker and kept the place in good condition. For the first two years he and Richard exchanged work, and then he said to Richard that he could work his own place and he would do his own work, and Richard told him he would be sorry for that. The home place consisted of 110 acres, worth $65 per acre, and the father, after he had given the eighties to Samuel and Richard, had often said that eighty acres of the home place was to go to Henry, and the remaining thirty to the daughter, and Henry must pay her enough money to make her share equal with his, and he had made one or two wills to that effect. Thereafter Richard would visit his father when Henry and his wife were away, and when they returned his father was angry, and complained that he was not keeping the place in orderly condition. The father was growing old, was almost blind, afflicted with serious heart trouble and rheumatism, and at times could walk only by use of canes. Richard would come to the house when Henry was at work on the place and hold conversations in secret with his father. Richard told his father to give Henry written notice to leave and he would have to go, and the notice was given and Henry left. Richard took charge of the home place, and after two years moved into the house with his father and mother, and when Henry came to visit them his father ordered him out of the house. When the daughter came to visit her father, she could hold no private conversation with him, and when she attempted to talk with him either Richard or his wife or daughter was always present and listening. Richard

Wendling v. Bowden.

transacted all his father's business, and after he had lived in his house more than two years the father made his will by which he gave to Henry and Samuel $250 each, and to the daughter the income on $2000, the principal to go to her children upon her death, and everything else to Richard. In the bequest to Henry he stated as a reason for giving no more to him that he had "heretofore received certain personal property belonging" to testator. The evidence showed that Henry when he went away had taken only such personal property as belonged to him, but Richard testified that he took $1500 worth of stock and other personal property belonging to his father. The father had stated that the daughter's husband had taken to hard drink, and that he had learned that from Richard; and there was testimony that the report was not true, and that her husband was in excellent circumstances. *Held*, that there was substantial testimony to show that the will was the result of the undue influence exercised by Richard upon the mind of the testator, and that the verdict and judgment setting the will aside cannot be disturbed on account of a lack of testimony to support that issue.

4. ———: ———: **Action at Law.** A will contest is a suit at law, and where there is substantial evidence tending to establish undue influence the appellate court will not reverse the verdict because the jury found against its weight.

5. **INSTRUCTION: Credibility of Witness: Comment.** The usual instruction as to the credibility of a witness, set out in the opinion, is not a comment on the evidence or on any particular witness.

6. ———: ———: **Character of Witness.** Nor is such instruction objectionable because it tells the jury in determining the credit they will give a witness they "should take into consideration the character of the witness," etc.; especially where there is much testimony to contradict the proponent of the will —and that necessarily involved his character. There is a broad distinction between character and reputation, and the two should not be confused. Character is what the witness really is, and is left to the jury to determine, from the many facts before them which bespeak it. It is often developed by cross-examination of the witness touching details of his previous life, especially where he is a witness, even though there is no attempt at impeachment by showing his reputation.

Appeal from Clark Circuit Court.—*Hon. Charles D. Stewart*, Judge.

AFFIRMED.

*Wm. L. Berkheimer* and *T. L. Montgomery* for appellants.

(1) While statutory will contests are in a sense *sui generis,* they are on the same footing as ordinary lawsuits and the trial judge may direct a verdict where there is no substantial evidence to sustain a certain issue, and may direct a verdict one way or the other based upon the existence of uncontradicted testimony on an issue or on the absence of proof on such issue. Teckenbrock v. McLaughlin, 209 Mo. 539; McFaddin v. Catron, 138 Mo. 213; Bradford v. Beasson, 207 Mo. 228. (2) Neither courts nor juries can make the wills for men; they ought to be careful in unmaking them. Lorts v. Wash, 175 Mo. 502; Hughes v. Rader, 183 Mo. 708; Conner v. Skaggs, 213 Mo. 349; Berberet v. Berberet, 131 Mo. 399. (3) There is no substantial direct or circumstantial evidence in the record showing that Richard Bowden, by undue influence at the time it was written, procured the execution of the instrument read in evidence, and the court should have given the instruction marked "A" asked by proponents, at the close of all the evidence, directing the jury to find for proponents. Teckenbrock v. McLaughlin, 209 Mo. 533; Weber v. Strobel, 236 Mo. 649; Turner v. Anderson, 236 Mo. 534; Shierbaum v. Schemme, 157 Mo. 1; Gibson v. Gibson, 24 Mo. 227; 13 Ency. Ev., 268; Winn v. Grier, 217 Mo. 459; Fulton v. Freeland, 219 Mo. 519; Hayes v. Hayes, 242 Mo. 168; Dausman v. Rankin, 189 Mo. 703; Giboney v. Foster, 230 Mo. 136; Carl v. Gabel, 120 Mo. 283; Sayre v. Trustees, 192 Mo. 95; Rule v. Maupin, 84 Mo. 589; Martin v. Bowdern, 158 Mo. 392; Cash v. Lust, Mo. 641; Wood v. Carpenter, 166 Mo. 477; Waddington v. Busby, 45 N. J. Eq. 173, 14 Am. St. Rep. 710. (4) There is no substantial evidence in the record authorizing the submission to the jury on the part of contestants, that there was such confidential and fiduciary relationship existing between

the testator and Richard Bowden, that cast the burden of proof upon the latter to establish there was no undue influence exercised at the time of the execution of the will, and instruction marked "B" should have been given as asked by proponents. Kischman v. Scott, 166 Mo. 226; Hamburger v. Rinkel, 164 Mo. 406; Campbell v. Carlisle, 162 Mo. 647; Norton v. Paxton, 110 Mo. 467; Goodman v. Griffith, 238 Mo. 716; Tibbe v. Kamp, 154 Mo. 575; West v. West, 144 Mo. 134; Martin v. Bowdern, 158 Mo. 392; Seibert v. Hatcher, 205 Mo. 104; Berberet v. Berberet, 131 Mo. 410. (5) Instruction numbered two given for contestants is in the nature of a comment upon the testimony of one witness and is an unjust reflection upon the testimony of the proponent in this case, and not applicable to all the witnesses. The jury is asked to take into consideration the character of the witnesses, when there was no evidence of the character of any one witness in evidence. The giving of the same was prejudicial and reversible error. There was no evidence introduced to authorize the giving of this instruction. State v. Gartrell, 171 Mo. 519; State v. Auslinger, 171 Mo. 600; State v. Hopper, 71 Mo. 430.

*Smoot & Cooley, John A. Whiteside* and *W. T. Rutherford* for respondents.

(1) The statute in relation to will contests is *in pari materia* with the statutes governing ordinary trials, and if there is any testimony, either upon the question of mental incapacity or upon the question of undue influence, the case should be submitted to the jury. State ex rel. v. Guinotte, 156 Mo. 520; Young v. Ridenbaugh, 67 Mo. 574; Appleby v. Brock, 76 Mo. 314; Harrison v. Lakenan, 189 Mo. 609; Mowry v. Norman, 204 Mo. 173; Mowry v. Norman, 223 Mo. 463; Moore v. McNulty, 164 Mo. 119; Roberts v. Bartlett, 190 Mo. 680; Harris v. Hays, 53 Mo. 90; Sehr v. Lindemann, 153 Mo. 288; Turner v. Anderson, 236 Mo. 542.

(2)  If the person who sustains a confidential rela-
tionship to the testator at the time of the execution
of the will is to get any pecuniary benefit, either di-
rectly or indirectly, under the will, a presumption of
undue influence will be indulged.  Barkley v. Cem.
Assn., 153 Mo. 315; Lins v. Lenhardt, 127 Mo. 271.
(3)  A discrepancy between a fixed purpose of the
testator, expressed in his declared intentions, and the
provisions of the will, which are favorable to those
in close relation to him at the time of its execution,
and who have opportunity to unduly influence him,
casts upon the beneficiary the burden of showing that
the will was not the product of undue influence.  40
Cyc. 1154; Carroll v. Hause, 48 N. J. Eq. 269; Matter
of Blair, 16 Daly (N. Y.), 540; Lee v. Dill, 11 Abb.
Pr. (N. Y.) 214; McCartney v. Bone, 33 Ala. 601;
Children's Aid Soc. v. Loveridge, 70 N. Y. 387; Swen-
arton v. Hancock, 22 N. Y. 38; McLaughlin v. Mc-
Devitt, 63 N. Y. 213; Whitelaw v. Sims, 90 Va. 588.
(4)  Undue influence may be shown by the relation
of the parties, the mental condition of the person whose
act is in question, the character of the transaction
and all relative facts and circumstances.  Dingman v.
Romine, 141 Mo. 466; Bradford v. Blossom, 190 Mo.
139; Myers v. Hauger, 98 Mo. 438; Roberts v. Bart-
lett, 190 Mo. 701; Meier v. Buchter, 197 Mo. 91; Do-
herty v. Gilmore, 136 Mo. 414; King v. Gilson, 191
Mo. 327; Allore v. Jewell, 94 U. S. 506; Griffith v.
Godey, 113 U. S. 89.  (5)  That the testator had the
right to dispose of his estate as he saw fit is undoubted,
but when the will is unreasonable the clearest evidence
is required that it was the deliberate offspring of his
own unbiased mind.  Harvey v. Sullen, 46 Mo. 153;
Meier v. Buchter, 197 Mo. 86; Schouler on Wills (3
Ed.), sec. 77; Underhill on Wills, sec. 105; Page on
Wills, sec. 385; Aylward v. Briggs, 145 Mo. 604; Red-
field on Wills (4 Ed.), pp. 516-537; Gay v. Gillilan,
92 Mo. 264; Maddox v. Maddox, 114 Mo. 49; McFadin

v. Catron, 120 Mo. 271; Catholic University v. O'Brien, 181 Mo. 68; Hughes v. Rader, 183 Mo. 710; Dausman v. Rankin, 189 Mo. 707; Bradford v. Blossom, 190 Mo. 139; Roberts v. Bartlett, 190 Mo. 700; King v. Gilson, 191 Mo. 327; England v. Fawbush, 204 Ill. 384; In re Budlong, 126 N. Y. 423.   (6)  Where the testamentary capacity of the testator, and undue influence exercised upon him, are in issue, it becomes material to know what were his previous purposes, intentions and state of mind, and statements made by him at, before and after making the will in question, and the contents and provisions of former wills made, if any, are competent evidence for these purposes.   Thompson v. Ish, 99 Mo. 160; Gibson v. Gibson, 24 Mo. 227; Rule v. Maupin, 84 Mo. 587.   (7)  In determining whether or not a will was the result of undue influence it is proper to consider the mental and physical condition of the testator, and the will itself is competent evidence on that issue, and may be read to the jury.   The question should be determined in the light of all the circumstances.   Myers v. Haugher, 98 Mo. 433; Young v. Ridenbaugh, 67 Mo. 586; Crowson v. Crowson, 172 Mo. 691; Roberts v. Blossom, 190 Mo. 701.   (8)  Undue influence need not be shown by direct proof, but may be inferred from facts and circumstances.   Doherty v. Gilmore, 136 Mo. 414; Dingman v. Romine, 141 Mo. 466; Bradford v. Blossom, 190 Mo. 139; Woerner, Law of Administration, sec. 32; Garvin v. Williams, 44 Mo. 465; Carl v. Gabel, 120 Mo. 297; Dausman v. Rankin, 189 Mo. 677; Roberts v. Bartlett, 190 Mo. 701; Myers v. Hauger, 98 Mo. 438; Gay v. Gillilan, 92 Mo. 263; Maddox v. Maddox, 114 Mo. 35.   (9)  When the will is unreasonable in its provisions and inconsistent with the duties of the testator with reference to his property and family, this of itself will impose on those claiming under the instrument the necessity of giving some reasonable explanation of the unnatural provisions of the will.   Gay v. Gillilan, 92 Mo. 264; Meier v. Buchter, 197 Mo. 90;

McFadin v. Catron, 120 Mo. 271. (10) Proponent Richard Bowden sustained a confidential relation to testator in this: (a) Richard Bowden was named executor of the will without bond. Bradford v. Blossom, 190 Mo. 143; Roberts v. Bartlett, 190 Mo. 700; Mowry v. Norman, 204 Mo. 191. (b) He was made trustee without bond of the $2000 fund for Mrs. Wendling. See authorities above. (c) Testator was very old, physically infirm from rheumatism, living with and dependent upon proponent, chief beneficiary in his will, for care, nursing, advice, and the management of his property interests, who did in fact manage all his business for him. Mowry v. Norman, 204 Mo. 191; Bradford v. Blossom, 190 Mo. 139; Roberts v. Bartlett, 190 Mo. 700; Dausman v. Rankin, 189 Mo. 706. (11) Defendant Richard Bowden, sustaining a confidential relationship to the testator, and being practically the only beneficiary under the will, a presumption of undue influence therefore arises, which shifts the burden of proof upon proponent, Richard Bowden. Lins v. Lenhardt, 127 Mo. 271; Barkley v. Cem. Assn., 153 Mo. 315; Campbell v. Carlisle, 162 Mo. 644; Hegney v. Head, 126 Mo. 627; Roberts v. Bartlett, 190 Mo. 143; Dausman v. Rankin, 189 Mo. 708; Maddox v. Maddox, 114 Mo. 40; Marx v. McGlynn, 88 N. Y. 357; Bradford v. Blossom, 207 Mo. 230. (12) It was the province of the jury, under all the facts and circumstances in evidence to pass upon the question of undue influence—as to whether the presumption of undue influence was removed by the evidence on the part of appellant. King v. Gilson, 191 Mo. 327; Mowry v. Norman, 204 Mo. 173, 223 Mo. 463; Gannon v. Gas Light Co., 145 Mo. 502. (13) The Supreme Court will not weigh the evidence in a law case. Harrison v. Lakeman, 189 Mo. 609; Mowry v. Norman, 223 Mo. 463; Buford v. Gruber, 223 Mo. 252; Knapp v. Trust Co., 199 Mo. 668; Lamb v. Railroad, 147 Mo. 171; State v. Tate, 156 Mo. 119; State v. Nalle, 96 Mo. App.

524; State v. McKenzie, 177 Mo. 238. (14) Whether any witness in the case testifies to the truth is a question for the jury. James v. Life Assn., 148 Mo. 15; Mowry v. Norman, 223 Mo. 463. (15) Undue influence may be exercised by creating resentment and false impressions in the mind of the testator. 40 Cyc. 1147 (8); Dausman v. Rankin, 189 Mo. 706; Current v. Current, 244 Mo. 436; Defoe v. Defoe, 144 Mo. 465. (16) It is not necessary that the overt acts of undue influence be exercised at the exact time of the execution of the will, but it is sufficient to show that such influence over the mind of the testator had been previously acquired and did operate at the time of making the will. Mowry v. Norman, 204 Mo. 193; Taylor v. Wilburn, 20 Mo. 310; Underhill on Wills, pp. 187-8.

WOODSON, P. J.—The respondents instituted this suit in the circuit court of Clark county to contest the last will and testament of Samuel Bowden, who lived for more than a half of a century in that county and died in the month of April, 1908.

The contestants and proponents are the sole surviving children who are devisees under the will, as well as the only heirs at law of deceased.

The petition charged mental incapacity on the part of the testator to make the will, and undue influence exercised over his mind by the proponents. The answer put in issue those charges and asked that said will be adjudged the last will and testament of said Samuel Bowden.

The will was signed and witnessed on July 5, 1906, nearly two years prior to the death of the testator.

The provisions of the will were substantially as follows:

1st. That all of the testator's just debts be paid out of his personal property.

2d.   Because as stated, he gave his son Henry only $250, for the reason stated therein, he had "previously given him certain personal property and because he has heretofore received certain personal property belonging to me," the testator.

3rd.   Samuel H. Bowden, his son, was likewise given only $250, because, as stated therein, he had previously given him certain real and personal property.

4th.   To his daughter, Mrs. Ida Wendling, was given $2000, free from the control of her husband, which is to be loaned at the highest rate of interest obtainable, she to receive the interest thereon during her life, but no part of the principal, except in case of extreme necessity she might "draw the principal in sums not exceeding fifty dollars. The remainder of the principal, at her death, to go to her children surviving her."

5th.   To his son Richard, was given the home place, consisting of 110 acres, with the dwelling house and other improvements thereon. This, however, was charged with the payment of all the aforesaid legacies, in case the personal property was insufficient to pay them.

6th.   Appointed Richard Bowden executor of the will.

On May 9, 1907, the following codicil was duly added to said will:

"I, Samuel Bowden, this 9th day of May, 1907, do hereby make and constitute the following a codicil to the foregoing my last will and testament; I hereby direct and will that the sum of two-thousand dollars named in item 4 of my will, at my death be by my executor, deposited in Clark County Savings Bank, of Kahoka, Missouri, at the highest rate of interest paid by said bank and the interest thereon be paid annually to my daughter, Ida E. Wendling, until she arrives at the age of fifty years, when the principal is

to be paid to her to be held by her as in said item four and at her death to be disposed of as stated in said item four."

A trial was had and after the introduction of all the evidence the court gave the jury a mandatory instruction to find for the proponents as to the charge of mental incapacity, thereby leaving only one issue for the jury to determine, namely: Did proponents through undue influence and fraud exercised over the mind of the testator, induce him, against his will, to make the will in controversy?

This question was, by the court, under certain instructions given, submitted to the jury, who by their verdict, answered it in the affirmative. Thereupon, the court rendered a judgment setting aside the will, and in due time the proponents filed a motion for a new trial, which was by the court overruled.

After taking timely and proper steps therefor, the proponents appealed the cause to this court.

Counsel for proponents assign sixteen errors, most of which, however, from the views we have taken of the case, are immaterial.

Counsel for appellant strenuously insist that this record contains no evidence which warranted the submission of the question of undue influence to the jury, and that the court should have given an instruction telling the jury that there was no evidence introduced tending to show undue influence on the part of appellants, the proponents, and to return a verdict establishing the will. Upon the other hand, counsel for respondents with equal vigor and earnestness, insist that the record contains ample evidence to support the verdict of the jury and the judgment of the court.

From this brief statement of the principal legal proposition presented for determination, it becomes necessary for us to review the evidence introduced *pro* and *con* upon that question.

Mr. T. L. Montgomery, for the proponents, testified:

That he was an attorney at law, and resided at and practiced his profession at Kahoka, Missouri, and in surrounding cities and towns. That he was well acquainted with Samuel Bowden, and had known him for thirty-five years, knew him intimately and transacted his legal business. That he prepared the will in question, read it over to him, and signed it as a witness, at the request of the testator. That before he signed it, the testator declared it to be his last will and testament. That at his request he signed the name of the testator to the codicil to the will. That George W. King, at the request of, and in the presence of the testator and himself, signed the will as a witness. That he and Bert Gridley attested the codicil at the request of the testator. That he saw both the testator and Gridley sign the codicil. That the codicil was written, signed and attested in his law office in Kahoka, after having been read to the testator. That he wrote the codicil at the request of the testator and after hearing it read, the testator stated that it was just what he wanted. That in his opinion, at the time the testator signed the will and codicil thereto he was of sound mind and disposing memory. That the testator was about eighty-two years of age at the time he wrote the will.

On cross-examination he testified that he thought the testator had rheumatism, but knew of no other ailments, except heart disease. At some former time he had a cataract upon one eye, but that had been removed, and after its removal he could see very much better. That the testator could write his name, and usually did so, and in a very good hand. That he did not write his name to the codicil, but he requested the witness to sign it for him. That he wrote a previous will for the testator, which was prior to the death of his wife, but did not remember the provisions

of it, nor who was the executor named therein. That
he had not made a previous, that is, a second will to
the one in controversy, to his knowledge. That at the
time he wrote the will in question, Richard Bowden
was residing in the same house with the testator, the
home place. That he had no knowledge as to whether
or not Richard transacted the business of his father,
the testator. That at the time of the testator's death
he had no live stock on hand; he had transferred it to
Richard by a deed of sale. That the witness wrote the
bill of sale at the request of the testator in 1904, and
told him, Richard, to have it recorded. Had no knowl-
edge what induced the testator to make the bill of sale,
except he stated that he wanted Richard to have the
stock. The testator told him how he wanted the will
drawn, and he drew it accordingly. Richard was with
the testator when the codicil was written. That dur-
ing the last few years of his life, Richard usually came
to town with the testator. The latter did some busi-
ness with the Exchange Bank. That he, the witness,
was president of the bank where the bequest to Mrs.
Wendling was to be deposited. The testator paid him
for his services for writing the will. There was noth-
ing unusual in having the bill of sale recorded that
he could see.

Redirect examination: Richard was not in the
room while the will was being written. The testator
knew what he wanted done, and would do it or have
it done; and when he once made up his mind regard-
ing a matter it was hard to influence him to change his
mind. He always had a mind of his own and he, the
witness, always let him have his own way. "You had
to."

George W. King testified in behalf of the propo-
nents as follows:

That he had lived within a quarter of a mile of
testator since 1875, and was well acquainted with him
and had visited his house. That he saw him often and

conversed with him frequently. That he signed the will at the request of the testator. The testator and Mr. Montgomery were present when he signed the will. At that time the testator was of sound mind and disposing memory. That he saw the testator frequently after he attested the will. Sometimes he would see him frequently and then again he would not see him for some little time. He never saw anything to indicate that the testator's mind was unsound up to the date of his death. He was a man of strength and of strong will power, a good business man and farmer. He was energetic and strong-willed. The testator came to Clark county before he did.

On cross-examination he testified: That he never attested any other will for the testator and was there but a short time upon that occasion. Richard did not go into the room with him when he signed the will. The testator at that time was almost helpless with rheumatism and walked very feebly, with a cane, also had some trouble with his eyes, but he read some. He had an operation performed on his eyes. That he did not know who transacted the business. Richard had charge of the testator's farm, but prior to that Henry had charge of it. That he did not know who was the testator's family physician in the latter part of his life. In 1902 Mr. and Mrs. Bowden were quite sick. Richard was the only child at the house when the will was signed. The testator was sitting down, and signed the will just as anyone else would have done. He was troubled with a swelling in his feet and limbs and was in that condition when he signed the will.

Bert Gridley testified on behalf of the proponents as follows: That he resided in Kahoka and was a lawyer by profession and had known the testator about thirty years. Was fairly well acquainted with him. That he signed the codicil at the office of Mr. Montgomery. He was sent for and found the testator and Mr. Montgomery there, and some other gentleman who

came in later. That he signed the codicil at the request of the testator, who said he was changing his will and wanted him to sign it as a witness. Mr. Montgomery wrote the testator's name to the codicil and the latter touched the pen. The testator said he wanted to make a change in his will, and the witness said he understood that he was adding a codicil to the will. The testator was right there, present, when the witness signed it; and he was of sound mind and disposing memory. The testator was an Englishman by birth; and was always regarded as a man of strength and power and a strong mind. Somewhat stubborn, one who could not be influenced to do a thing he did not want to do. Richard came after the witness and requested him to sign the will.

Here the proponents rested their case; and thereupon the contestants introduced their evidence, as follows:

Counsel for contestants in their statement of the case have chopped up and so mingled and confused the testimony of the various witnesses that it is of but little value to us, and consequently we will have to go over the record and select such evidence as we think tends to prove their side of the issue.

Henry Bowden testified on behalf of the contestants as follows:

That he was a son of the testator and a brother of Richard and Samuel H. Bowden, and of Mrs. Wendling. Richard and Samuel married before he did. That his father purchased two eighty-acre tracts of land near the home place; he gave one to Richard and the other to Samuel. That was before they married; and the testator hired men and had those lands cleared up for them. That he was about twenty-five years old when he married, and at that time lived with his father on the home place. That he did the farm work and took care of his father and mother.

That his father had rheumatism and was in bad shape. That he received no wages from his father for said work. His father made a will before he, the son, was married. That the testator told the neighbors time and again that he was to have the eighty acres on which the dwelling house stood; Mrs. Wendling was to have the thirty acres, the remainder of the home place, and he was to pay her the difference in the values of the thirty and eighty-acre tracts. That the testator told him that he had made a will to that effect. That was after he married and was living with the testator. That he and his wife lived with the testator about three years and they got along nicely together; and his father was as fond of his, Henry's, wife as if she had been his own daughter. That after living there about two years, a change came over the testator. That during the first two years he lived with his father he and his brother Richard exchanged work with each other, but during the third year he told his brother he was not satisfied with that arrangement and that he then told him from thence on he would do his own work and he, Richard, to do his own. That seemed to offend Richard and he said you will be sorry for that.

Thereafter Richard would come to the house while he, the witness, was away, and when he would return home he would find his father in a bad humor. Richard would tell him the fences needed fixing and that everything was going to rack; and his father would say to witness, "Why don't you fix the fences and not let everything run down?" Something of this character would occur almost every time Richard would visit the father. Some two or three times a week. That finally Richard asked his father why he did not notify him, the witness, to leave the place, and told him that he, the witness, would then have to leave. That in a few days afterwards he received a notice

notifying him to quit the place, and shortly thereafter he left.

That testator never gave him any real estate and but little personal property. When he was seventeen his father gave him a colt, and he traded that for a mare from which he raised three colts. That when he was married his father gave him a cow and calf. Later he gave him a heifer and a steer and said that he, the witness, had taken good care of things and for that reason he gave them to him. That when he began to farm his father gave him a new breaking plow. Those things are all the property that his father ever gave him. At the time the will was made he had purchased a farm but had not paid for it.

That he consulted his father about marrying and he had no objections thereto. That in addition to doing the farm work he assisted in doing the washing, sweeping, making beds and caring for his mother. Part of the time she could not comb her hair and then he would do it for her. That after Richard moved to the home place, he transacted practically all of his father's business. At that time his father had seven or eight head of horses and about the same number of cows, calves and yearlings. That the fall before he left his father's place Richard came and got the cattle and drove them home.

In 1901 or 1902, he and his wife went to his father's home to see their mother who was sick in bed; and while sitting there and talking his father came in and ordered them from the premises, adding that they had no business there, and that he wanted them to leave. They left when so ordered. At first his father treated them all right, but later he was satisfied that his father had a talk with Richard, and it was then that he ordered them away.

In 1906, prior to the operation, his father was at one time blind. That he saw his father occasionally after his mother's death and whenever he saw him he

would speak and his father would ask, is that you Henry, and would then shake hands. Before his father died, witness heard he was very sick and low, and he went down to see him. That he himself had been sick at that time.

That after he left his father's house he never had an opportunity to have a private conversation with his father; either Richard, his wife or daughter was ever present when he was on the premises. That his father never visited him; he always made some excuse for not so doing. That he had heard his father had made a will before he died, but never knew or heard what its provisions were. That he never knew of his father visiting Mrs. Wendling, but heard that he did so once. That his father gave Richard the same amount of live stock that he gave him.

That during the first two years that he lived with his father, they had no serious troubles. They had some family disputes, but when they were over they were all over, never had any hard feelings toward each other. But beginning in April or May of the third year of his stay with his father their troubles began. When Richard would come over he would take father into a room and talk to him privately. This would occur once, or twice a week. The talk Richard had with father regarding his getting the place was not held in my presence. That within three or four days after Richard had that conversation with his father, witness was served with the notice to vacate the premises. That at this time his father "was getting feeble in mind and body."

On cross-examination he testified as follows:

That he resided nine miles from his father and had lived there about seven years. Lived upon a farm of 170 acres. That he had been married thirteen years. Richard was married about one year before. At that time he was living with his father and shortly thereafter he moved to his own place which was only a mile

away.  At that time Samuel was living with his father on the home place, or at least he was when Richard was married.  Samuel was married shortly before the marriage of the witness, some six or seven months. Richard and Samuel each had a farm of eighty acres of their own.  That his sister, Mrs. Wendling, had been married about fifteen years.  That he gave his father one-half of the crops raised on the farm for the rent thereof.  That his father told him that he could bring any stock to the farm he saw proper to do, provided it was no more than what he, his father, had. That while he lived with his father, the latter had some eight or ten cows and five or six head of heifers and calves, and seven or eight head of horses.  That when he left the home place he took with him some ten or twelve head of cattle, four sows and some pigs, one load of corn and three loads of hay.  That he did not take any of his father's cattle with him, and all the hogs that he took belonged to him and not to his father.  That he took his own buggy, harness and team. That at the time he left, his father and mother were in poor health and needed some one to take care of them. That he left the farm in 1900.  That he went back in about a year when his mother was sick.

Richard was at the home either the day or the day previous to the first trouble he, the witness, had with his father.  That at that time he and his wife went visiting and when they returned he found his father and mother out of humor.  That his father complained as to how the place was managed and cared for during the first two years he lived there; but after that time the trouble began.  Just after Richard would come over, his father would complain of him for not keeping up the fences, clearing out the stables, etc.  That in reply he would tell him that the fences were in good repair and the stables were kept clean, etc.  Did not take from the farm one hoof of stock that belonged to his father.

Charles Vanosdol testified on behalf of contestants as follows:

That he resided in Keokuk, Iowa, and was acquainted with Samuel Bowden, deceased. That some ten or eleven years ago he went to the farm of Mr. Bowden to purchase a horse, and while there Henry was combing his mother's hair, like she was a child. Mr. Bowden said to me, "I have divided up my property, and I think I have done it right." I told him I didn't know that it was a good idea to divide the property now. He says, "I have two sons, and I have given each one eighty acres of land. Henry gets the home place, and forty or thirty acres to the daughter" and then Henry would have to pay enough cash to make the daughter even up with him; that is, that Henry would have to pay enough, would have to pay his sister enough, to make them two even. I said, "I think you have done it as good as you could." Q. What was said in the morning? A. In the morning we walked out in the yard and he pointed out this land, this forty acres, or thirty, and said, "this land my daughter gets and Henry gets the home place but he has to pay his sister enough to make it even."

Cross-examination by Mr. Montgomery: Henry was living on the place when I was there. He was married. That was eleven years ago. I can't give the month. Was the latter part of the summer, it was warm yet. . . . "Q. I mean this conversation, you never told anybody about it? A. I probably told this attorney this forenoon. Q. Is that the only person you told? A. Yes, sir. Q. When did you tell the attorney? A. This forenoon. Q. This is the only time you have told it since the conversation occurred? A. Yes, sir, that is all. Q. You must have a pretty good memory. A. I think my memory is pretty good yet."

Henry Bowden and his wife were there and heard the conversation between me and his father.

Recross-examination by Mr. Montgomery: "Q. You were subpoenaed here in town? A. Yes, sir. Q. You come across the line voluntarily? A. I had a little business in town. I believe Mr. Bowden sent for me to come over. Q. When did he tell you he wanted you? A. Last Wednesday he phoned to me. I told him I didn't know whether I could come or not."

J. B. Wade, sworn on the part of the plaintiffs, testified as follows:

Reside at Kirksville. Am 66. I formerly lived in Knox county, and I also lived over here on Fox. I was acquainted with Samuel Bowden. "Q. How intimately were you acquainted with him? A. I suppose ever since about '70. I thrashed for him in '70. Q. When you lived in Knox county did you visit in the neighborhood? A. Sometimes and would see him. Q. Did you have any talk with him after his wife died? A. Yes, sir. Q. What was that conversation as near as you can remember? A. Something about the division of his property. . . . Q. After his wife died what was the conversation that you had with him? A. Well it was after his wife died and he was talking about the property and he said he had made a will, and that he had given Henry Bowden and his sister the home place. That's what he told me. Q. Did he say why? A. He said he had helped the other boys. Q. What did he say about his condition? A. He said he was in bad health, that he was almost helpless and that he thought it was time he was fixing up his affairs, talked along that line. I stayed there for dinner that time. Q. Did he say anything about any other wills? A. He spoke about my father's will and about the disposition he had made of his property and said that he thought it was a just will. We talked about a good many things. Q. Did you see him after that? A. I saw him once or twice after that. I can't remember the dates. Q. Did he say anything to you about Henry and his wife? A. He said he had been

out of humor with Henry, that he didn't like Henry's wife. I don't remember when his wife died, but anyway me and my wife were sent for, and I was there back and forth and that's how this matter come up. After his wife died I had been there a time or two and I didn't notice Henry or Sam; then I heard that the old man wouldn't let them come. I went down to the place to see the old gentleman about it, to speak to him about it, about the boys not coming. The old man said that he would like to have them come and finally at his request I notified them, notified Henry, and he come down. Q. In 1905 and 1906 did you notice any change in the old man's mind? A. He was considerably afflicted then with rheumatism. I can't state exactly the state of his mind. Q. You knew Henry when he went on the farm? A. I always thought he worked well.''

On cross-examination: ''Q. The time you had the conversation about the timber was Mrs. Bowden alive? A. Yes, sir. Q. When you had the second conversation Mrs. Bowden was dead? A. Yes, sir, about a week or a little longer. Q. He never said anything to you about a will? A. He never told me he was going to make one. Q. When you had this conversation was Dick there? A. Yes, sir. Q. Was Dick living there then? A. Yes, sir, he was living there when his mother died? Q. You observed the boys at work on the farm? A. Yes, sir. Q. The old gentleman was a very good farmer? A. Yes, sir, he was a very good farmer. Q. Tried to have his farm work done good and looked after it well? A. Yes, sir. Q. I will ask you if he wasn't self-willed, a man of strong will and wanted to have his own way? A. Yes, sir. Q. That was characteristic of him? A. Yes, sir. Q. He had been a successful farmer? A. Yes, sir. Q. Managed his business well? A. Yes, sir, I think so. Q. Was a man of ordinary intelligence? A. Yes, sir. Q. He never

did state what provision he was going to make for his wife? A. His wife was dead when he talked to me this time I spoke about. Q. His mind was all right? A. Yes, sir. Q. What year was that? A. 1902. Q. His wife died that same year? A. Yes, sir." He was a sufferer from rheumatism.

W. R. Vanfossen, sworn on the part of the plaintiffs, testified as follows:

Am acquainted with Henry Bowden, one of the plaintiffs here. "Q. Do you remember when he left his father's farm and moved onto a farm he had rented? A. Yes, sir, John Houston farm. Our farms joined. Q. Do you remember what property he brought there when he come? A. Not exactly. Q. Approximate it? A. Ten or eleven or twelve calves, might be more or might be less, four head of horses and two colts, a little driving team, and I think one of the four was a blind horse and I believe there was another. I am almost sure there were four head of horses. Q. Were you acquainted with Henry Bowden when he lived on his father's farm? A. Yes, sir. Q. How was he as to being industrious? A. He was an industrious, hard-working man. I know he got more done than I could."

On cross-examination: "Q. How long since he lived on the Houston place? A. I suppose '99 or 1900. Q. What month was it he left the Houston place? A. First of March. Q. Before you went on the witness stand had you been discussing how much stock he had? A. He asked me. Q. Have you discussed it with him? A. He told me what he wanted. I told him I didn't know much about it. Q. Didn't he tell you how much stock he took there? A. No, sir. He said you know about what stock I had when I went there. I told him I didn't know for certain. I told him I didn't think he had more than ten or twelve head of cattle. Q. Did he say he had less? A. No, sir. Q. When did you have that talk? A. Just about a

week ago. Q. Did he discuss how many hogs, and how much grain, oats and corn he took there? A. No, sir. Q. Never discussed that with you? A. No, sir.''

Fritz Boon, sworn on the part of the plaintiffs, testified as follows:

I reside a mile east of here. Was acquainted with Samuel Bowden, Senior. Have known him all my life. ''Q. Were you well acquainted with him? A. Yes, sir. Q. Would you see him quite often? A. Yes, sir. Q. Did you ever have any conversation with him about his property? A. Yes, sir. Q. About when was that? A. I have talked with him two or three times about his property twelve or thirteen years ago. Q. What was the conversation you had with him first? A. He told me about the land that Sam and Dick had, that they had it paid for, that Sam got one eighty and Dick the other, and he said he would divide the home place between Henry and Ida. Q. How many times did you have that conversation? A. Two or three times he told me that Henry and Ida were to have the home place. Q. Did he say he had given eighty to the boys? A. Yes, sir. Q. In the latter part of his life did you observe any change in his condition. A. Not very much. I didn't see him very many times. Q. Did you notice that he was failing in health? A. The last time I talked to him he seemed to be a little feeble. He was growing pretty feeble. His eyesight was poor and he was in pretty bad shape. Q. Did you notice whether or not his mind was weaker? A. I don't know that it was. I didn't talk to him only a few minutes. Q. Do you know who attended to his business, the running of the farm? A. Dick attended to the farm. Q. Tended to the old man's business for him? A. I think so, yes, sir. Q. Did the old man do any business that you know of? A. Not that I know of.''

Redirect examination: "Q. Did he have stock on that farm and use the farm as if it was his own farm? A. I suppose so. Q. Were you acquainted with the place before Henry was married? A. Yes, sir. Q. How was the place kept up then? A. I couldn't see very much difference at any time. Q. How was Henry as to being industrious and a hard worker? A. I think he was industrious, and a very hard worker."

Sam Hiller, sworn on the part of the plaintiffs, testified as follows:

"Q. What is your occupation? A. Cashier of Exchange Bank, Kahoka, Missouri. Q. How long have you been there? A. Fourteen years. Q. Did Samuel Bowden keep an account with you? A. Yes, sir. Certificates of deposit and accounts. Q. From 1900 to 1907 have you got an account showing his certificates? A. Yes, sir. Have the certificates, and the records of the different transactions. This memoranda I have is prepared from the certificate register. I can get the certificates. Q. Very well, I guess we better have them."

Mrs. Ida Wendling, sworn on the part of the plaintiffs, testified as follows:

"Q. What relation are you to Samuel Bowden, Senior? A. His daughter. Q. Were you the only daughter? A. Yes, sir. Q. How far did you live from him the latter part of his life? A. I suppose about three miles and a half. Q. When were you married? A. 1894. Q. Do you remember about the time your mother died? A. 1902. Q. Did you stay at home at your father's house during the time she was sick? A. I was there just a week before she died. I stayed there from Monday until Friday. She died Friday night. I lacked two days of staying there a week. Q. After Henry left or any time did you have a conversation with your father about his property? About what he was going to do with it? A. I have

heard father say what he intended to do with his prop-erty. He had given Richard and Samuel these two eighties, and the homestead, 110 acres, was to be di-vided between Henry and I. Henry was to have the home place, eighty acres and then he was to pay me enough to make it even, that's what he wanted to do with the property. Q. You don't know whether Rich-ard had any influence over your father or not? A. I can't say as to the influence. We couldn't talk to fa-ther but what Richard would be there listening. Q. Do you know of Richard tending to any business for Henry after he left there? A. I was there one time and remember of father sending him after some money, and he brought the money home. Q. Did your father give him any check to draw it? A. I didn't see any papers. Q. What was the feeling between Richard and your husband? A. Not very good. Q. Not friendly? A. Never was friendly. Q. Did you have any conversation with your father about the financial condition of your husband? A. Yes, sir. Q. What statement did your father make in reference to that matter? A. He said he had heard my husband was financially busted. Q. How did he say he had heard it? A. He said Brother Richard brought the news from town? Q. Did your father then make a de-mand on your husband for $300 that he had borrowed from your father? A. Yes, sir. Q. What did you do? A. Paid it right then. Q. What was the finan-cial condition of your husband then? A. Always had money whenever he wanted it. Q. When did you as-certain that this will was made in the shape it was. A. Not until after father's death. Q. Had you ever heard about such a will as that? A. I had heard that Brother Dick was to get all the property. I didn't know what was in the will until after his death. Q. Had you ever heard that your father had given Dick a bill of sale for all his personal property? A. No, sir; never until after his death. Q. Did you

father ever given you any personal property? A. Before I was married father gave me a Jersey calf and he gave me a colt. Q. How old were you when you were married? A. Twenty-seven past. Q. Had always lived at home and kept house? A. Yes, sir. Q. At any time did you put any money in a loan with your father? A. Yes, sir. Father was making a loan at one time and I put in $20. Q. What did Richard give you? A. It was $20 at the rate of eight per cent per annum, and there would be one dollar and sixty interest and he gave me a dollar and a half and said it was worth ten cents to bring it to my place. Q. Were you ever there when your Brother Henry lived there? A. Yes, sir, twice. Q. What was the relationship between them then? A. Seemed to be getting along good. Q. What was the condition of your father physically the latter part of his life? A. Was very feeble. Q. How long had he been that way? A. I can't say. Q. What seemed to be the matter with him? A. Rheumatism and heart trouble. Q. Could he move around good? A. He was crippled up, couldn't move his feet good, had to slip them along. Q. How was his eyesight? A. He had a cataract on his eye and had it taken off. Q. Were you ever there when he would fail to recognize you until you would speak? A. He couldn't recognize even members of the family at times until after they spoke. He couldn't see a chair in the room, would have to feel for a chair to sit down on. Q. Did he visit you after Richard moved on the place? A. He was there once. Q. Did you have a conversation with him? A. Only just before the family; he bid me good-by, he pressed $5 in my hand. Richard and his family had stepped out to go home. Q. They didn't see him give it to you? A. Not that I know of. Q. What was Henry's condition financially at the time this will was made in 1906? A. I don't know. Q. Do you know what property he

had? A. No, sir. Q. Did you ever receive any of the household goods at the time you were married or at any other time? A. No, sir.''

W. B. Sisson, sworn on the part of the plaintiffs, testified as follows:

''Q. What is your occupation? A. Physician and surgeon. Q. You reside in Kahoka, Missouri; how long have you been practicing here? A. Twenty-one years in March. Q. Were you acquainted with Samuel Bowden, Senior, in his lifetime? A. Yes, sir. Q. How long had you known him before his death? A. Fifteen or sixteen years; I think I met him in '92 or '93. Q. Were you ever called to attend him? A. I was called there on consultation with old Doctor Mc-Kee. Q. Who was sick? A. Mrs. Bowden. Q. How long were you his family physician? A. Continuously from 1901 to his death, and before that for a part of the time. I done his practice from 1895. Q. Do you remember of being out there at a time a will was said to have been made? A. Yes, sir; I think that was in 1902. Q. What condition did you find him in? A. He had been sick. I think he and his wife had pneumonia; that's my recollection. I think maybe that same day he was a little excited. I was out there in the morning and was called again after supper. Q. How did you know that a will had been written at that time? A. I can't say. Mr. Montgomery and his brother were there. I don't know whether they were there when I got there or not. Q. Was the old man excited? A. Yes, sir. Q. What had the old gentleman been suffering with towards the latter part of his life? A. Rheumatism, and organic heart dis--ease. He had had a cataract on his eye and I assisted Doctor Lapsley in removing it. Q. This organic heart trouble with which he was afflicted, in addition to his other ailments, would that have a tendency to weaken his mind, or cause him to be in such a condition that he would be easily influenced? A. Frequently it does,

yes, sir. A man in that state of mind would be weaker and probably more easily influenced. He was childish. He wasn't demented, but naturally was childish. Q. Would you say that he was in a condition that he would be easily influenced? A. Any man that is childish would be easily influenced."

Cross-examination: "Q. You had occasion to go and see him when he was suffering? A. Yes, sir, when he was sick. Q. You never interrogated him about his business affairs? A. No, sir. Q. You would simply examine him and administer the medicine you thought best for him to have? A. Yes, sir. Q. You never had occasion to talk to him only when he was sick? A. For several years before he died he was in the habit of taking some medicine I think. I don't think he went over two or three weeks without taking medicine. Q. How often did you visit him in 1906? A. I don't know without looking at my books. Q. The time he had pneumonia and his wife died you saw him more frequently? A. Well, the last three years before he died I would see him once a month anyhow. Q. Haven't you sent him medicine without going to see him? A. Yes, sir; he had organic heart disease. Q. Since you have known him what would you say as to whether he was a man of strong will power? A. In his younger days I should judge he was a man of considerable will power. Q. Ordinarily when you would go to see him it was when he was sick and suffering? A. I suppose he would be sick, yes, sir. Q. He was a man that had a good memory? A. Probably did have in his younger days. Q. You are simply telling his condition when you would be there and see him? A. Yes, sir."

Redirect examination: "Q. What were the remedies you administered to him? A. Well, remedies for the heart trouble and dropsical affliction; and he would improve for a while. You see his circulation was poor and I would give remedies to improve that.

Q. Would he be kind of drowsy? A. Yes, sir, at times. Q. Might not the medicine have a bad effect on his mind? A. Primarily it would benefit him, would benefit his mind from the fact that it would restore the circulation; his heart trouble would tend to produce dullness, and the heart stimulant would relieve that to some extent.''

The bill of sale previously mentioned, from the testator to Richard, was for two horses, three milch cows, one two-year-old heifer, three yearling steers, three spring calves, one binder, one two-horse wagon, one cultivator, one planter, one corn sheller, one sulky hay rake, and all farming implements and utensils on the farm, and the consideration therefor was $200. This was duly acknowledged and recorded November 15, 1904.

Contestants then introduced in evidence about twenty certificates of time deposits of various dates and for various amounts, on the Exchange Bank, in the name of Samuel Bowden, all of which were indorsed by R. S. Bowden; the two last by him as administrator. The cashier of the bank testified that all of those transactions were conducted by Richard Bowden for his father, Samuel Bowden; also that prior thereto Henry Bowden had made three similar deposits for his father.

Andrew O'Day, sworn on the part of the plaintiffs, testified as follows:

Was acquainted with Samuel Bowden in his lifetime. Was acquainted with Mr. Wendling, and Richard Bowden. ''Q. Did you have a conversation with Richard Bowden about Mr. Wendling? A. Yes, sir. Q. What was it? A. He spoke to me about Mr. Wendling going to hard-drinking. I said it was a mistake, that he would only take a glass of beer or two. Q. Was he drinking to excess at that time? A. No, sir. Q. How has he been financially from 1902 on up? A. He was pretty well fixed, a hard-working, indus-

trious man with plenty money. He was in good circumstances. Q. You have been around his home? A. Yes, sir. Q. Do you know how much land he has? A. Three hundred and seventy-five or four hundred acres. Q. How does he live? A. He lives mighty well. Q. Did you have a conversation with Samuel Bowden, Sr., about his daughter? A. Yes, sir. Q. State what that conversation was? A. I had visited there (Mr. Bowden's) on Sunday before he died. We sat there in the room and talked probably two hours, and in his talk he said he understood that Mr. Wendling had gone to drinking, drinking hard. I said that's a mistake; he has not. Q. What further was said? A. He said Ida worked hard on this place and I feel sorry for her. And he says, she is working hard yet. Q. Was there anything said in that conversation about the financial condition of Mr. Wendling? A. I don't recollect of anything being said."

Cross-examination: "Q. During the years 1902 and 1903 was he very much in debt? A. I don't know. I didn't look after these matters. I don't know how much he was in debt. Q. You said you knew he owned this land? A. I knew he was in possession of it."

All this testimony was objected to and exceptions duly saved.

P. I. Wilsey, sworn on the part of the plaintiffs, testified as follows:

"Q. What position do you occupy in Clark county? A. I am collector of Clark county, Missouri. Q. Have you got a copy of the assessment list of S. H. Bowden, 1901, for the taxes, 1901? A. Yes, sir, Q. Will you turn to it? A. Taxes show, the assessment was for 1900, assessment year 1900 for taxes 1901 shows it was on two horses, six cattle and six hogs, and thirty dollars' worth of other personal property."

Cross-examination: "Q. What is that you have? A. Assessment for 1900 for taxes 1901."

Plaintiff rests.

Richard Bowden testified on behalf of proponents as follows:

I am one of the defendants in this case. Henry Bowden lived on father's farm in 1899 and left in 1900. At the time he left he took with him twenty-one head of cattle from yearlings up. They were worth about thirty dollars a head. He also took eight head of horses worth about $100 each; forty head of hogs, worth four or five dollars each; four or five loads of corn, worth forty cents per bushel; three or four loads of oats, worth thirty cents a bushel; four or five loads of hay, worth six dollars a ton. He also took a buggy, plow, a cultivator and some harness. All of said property was worth about $1500 or $1600.

The farm was not in a very good condition when Henry left it; he had let the hedge fences grow up, all of which were about one mile in length. It had not been trimmed for two or three years. The manure was about two feet deep in the stables. All other fencing on the place was in bad shape.

That he did the chores for his parents from 1900 to 1902, and after that rented the farm and moved down there, and gave one-third of what was raised thereon as rent. Father and mother were at that time in poor health.

He rented the farm and moved down there at the suggestion of his brother-in-law, Mr. Wendling, and that suggestion was satisfactory to his father, as he said he and Henry could not get along together. That he had nothing to do with his father having Henry move from the place. He knew his father was dissatisfied with Henry, but he did not talk to Henry about his going on the place; but did talk to Wendling. That after he moved to his father's place, Mr. Wendling visited there frequently, so did Mrs. Wendling. They were both there at the time of his mother's death, which was in 1902, and came there after her death.

That he knew of the bill of sale from his father to himself, selling the personal property therein mentioned. Father said he was unable to care for the same and would sell it to him for $200, the price therein stated. He paid the price and took the property.

That while there he transacted his father's business. "Q. At whose direction? A. At his direction.

"His money and property were kept separate from mine. I hauled and sold his grain, and he cashed his own checks given therefor. I was always directed by my father as to how to transact his business."

He was named as executor in the will, but did not know that fact until after the death of his father. He got it from the office of Mr. Montgomery. He had it sealed and locked up in his desk.

That he never in any manner influenced his father in making the will; nor did he ever have a conversation with his father as to what he should will to Samuel, nor as to any of the other children.

That he never told his father that Mr. Wendling was financially broken, or anything regarding his financial condition.

That he heard Henry testify regarding his looking after his father's certificates of time deposits. That said testimony was correct and that he attended to the same at his father's direction, but always kept his business separate from his own. That his father kept his certificates in the bureau drawer, and the witness kept his in his trunk up stairs. In all money matters the witness would give his father his certificates and keep his own. He would put his away. Whenever his father wished to cash a certificate of deposit, he would give it to witness and he would take it to the bank and have it cashed; and if the certificate was to be renewed, he would have it renewed, surrender the old one to the bank and give the new one to his father. That after the death of his father he found

all of the certificates of deposit in the bureau drawer where his father kept them. That they were inventoried by him as executor, and he cashed them and accounted for the proceeds thereof.

There was shown to witness a number of checks drawn by himself and payable to various parties, for various amounts, for various purposes, which were identified and introduced in evidence without objection, among which was one for $2000, payable to himself and deposited for one year in the Clark County Savings Bank, bearing three per cent interest on account "of Mrs. Ida Wendling, under the will of Samuel Bowden, deceased."

On cross-examination he testified as follows:

That he knew his father had made a will, and that his father told him that he left it with Mr. Montgomery for safe-keeping.

That he and his father never talked of the will before it was made. That at the request of his father he went for Mr. Montgomery to go out to his father's house, as he wanted to see him. That he did not go after Mr. King to come and sign the will. That he knew nothing about a will that was to be made; that his father had never mentioned it to him, and that he knew nothing of it until his father made the codicil thereto. Did not then know what disposition his father had made of his property, nor never knew that until he heard the will read after his father's death.

That he knew nothing about Henry's going off the place. Did not go down there and talk to his father about that fact. Did not go down there and tell his father that Henry was letting the place go to rack.

Father gave William and Samuel each an eighty-acre tract of land near his home place. William went West and deeded his eighty to Samuel, and in consideration thereof, Samuel deeded his eighty to me.

My sister worked at home while living there; so did Henry; all of us worked on the farm, but sister

did not work in the fields; she had plenty of work in the house to do. We had a girl there to assist her to do the work.

Never said to anyone Mr. Wendling was drinking. Never talked to his father about depositing his sister's legacy in the Clark County Savings Bank. Father did his business with the Exchange Bank. Never talked to his father about how many cattle Henry took from the place when he moved therefrom. He was not there when he took them, but he drove them by his house when leaving there.

Young Irvin was assisting him to drive them and there were twenty-one head, but did not remember how many cows, calves nor yearlings there were. He had eight head of horses and two colts. Did not tell anyone about this. He supposed his father knew of it. "I don't know of it, if I did. Q. Didn't you tell him (your father) that you saw him, Henry, taking twenty-one head of cattle, forty head of hogs, eight head of horses, when you were talking to him about it? A. I don't remember. . . . We talked some. Yes, sir." He drove the stock right by my house. He did not go to his father's that evening. He went the next day, but never said anything to him about the stock which Henry drove from the place.

He had nothing to do with the notice that was served upon Henry to leave the place, nor never heard of it until yesterday.

He had heard his father complain of Henry. We talked about the matter a couple of times. He talked to his father whenever he went over there, and paid no attention as to whether Henry was there or not.

He had some trouble with Mr. Wendling. It grew out of a loan of $100 he made to him. He agreed to pay me five per cent interest, but never paid it. Never had any trouble with him over his wife. He never told her to stand up for her rights and he would pay her

attorney fees. Never bought any calves with Henry. He had received a horse and cow from his father.

Thomas McCarty testified for proponents as follows:

That he had resided in Clark county ever since 1852, and knew Samuel Bowden ever since 1870. Resided about one mile from him. Had visited him and had various business transactions with him. That he never saw anything wrong with his mind, and it was good the last time he saw him. Mr. Bowden was a man of very strong will, and nothing could influence him. He was a successful farmer and business man. He kept the farm up, and everything in good repair.

On cross-examination: Richard Bowden married my niece. Mr. Samuel Bowden was very feeble during the last few years of his life. He could not get around. He was fixed in his opinions, but reasonable; if he made up his mind about a person he stuck to it.

Frank Neff testified for proponents as follows:

I reside in Clark county and am a farmer. Knew Samuel Bowden, Sr., since 1868. He resided about one mile from him, their farms joined. Saw him quite often and visited him at his home. He remembered when he died. In his opinion, he was a man of sound mind and reasonable. He had a mind of his own and it was characteristic of him that he could not be easily influenced. He had a talk with deceased a week or two before his death, and in his opinion he was then of sound mind. Did not see any difference in his mind when sick or well. He always kept his farm up in good condition. His fences were good. Did not remember much about that when Henry left, but he thinks he left the hedges untrimmed.

On cross-examination: In 1892 he moved a little further from Mr. Bowden than he was prior to that time and consequently didn't see him so often, although he would see him occasionally. Knew Henry; he was a good worker. He and his father got along

all right up to about a year or two before the old gen-
tleman died. He never knew what their troubles were
about, only what he was told. Mr. Bowden was feeble,
had rheumatism and he heard he had heart trouble;
also, he could not walk very well. He always walked
with one, and part of the time with two, canes, and
some of the time not at all. His eyesight was poor, at
times he could hardly see. He had an operation per-
formed on his eyes, and after that he saw much bet-
ter.

Thomas Wood testified on behalf of the propo-
nents as follows:

That he was a farmer and resided two and one-
half miles from Mr. Bowden. Knew him well. He
was a man of sound mind, self-willed and was not
easily influenced as to his opinion.

On cross-examination: He had rheumatism and
could not get around very well.

C. W. Yant testified for proponents as follows:

Reside in Kahoka, am a lawyer. Have known
Mr. Bowden for many years. He lived near him be-
fore he began practicing law. The families were good
friends. He was a man of sound mind and strong
will.

Robert Wood testified for proponents that he
knew Mr. Bowden well and that he was a man of
sound mind.

John Wood testified for proponents that he had
known Mr. Bowden well ever since 1896; that he was a
man of sound mind, and strong will power.

Louis Neff testified for proponents, that he knew
Mr. Bowden; that he was a man of sound mind and
was a self-willed man, not easily influenced. He was
that way up to his death.

James Brickey testified for proponents, substan-
tially the same as did Louis Neff.

Hesekia Kilmer, by deposition, testified for pro-
ponents substantially the same as Neff.

John King testified for contestants in rebuttal, as follows:

I know the Bowden farm; it is worth sixty-five dollars per acre. Have seen Mrs. Wendling working there, raking hay and gathering up the haycocks when they were putting up hay. Do not remember of see- ing her do any other farm work.

Sarah Irvin testified for contestants that she did not remember of Dick coming to his father's place in the absence of Henry, and showing him over the farm.

John Irvin testified for contestants as follows:

Don't know how often Dick came there while Henry lived there. I helped Henry Bowden move his stock from the old place. He took cattle and horses both, sixteen or seventeen head, that includes the colts, calves and everything. "Q. Do you remember one Sunday when Richard Bowden came down to the old home place and took his father out over the farm, one Sunday while Henry was away? A. I cannot say whether it was Sunday, Monday or Tuesday. Q. While Henry was away? A. Yes, sir. Q. Do you remember Dick going down there and taking the old gentleman out over the farm in a buggy when Henry was away from home? A. I can't say whether Henry was there or not. Q. When was that? Was it towards the latter part of the time that Henry stayed there? A. I think it was along in summer. Q. Went before Henry left? A. Yes, sir."

Cross-examination: "I had a conversation with Henry Bowden with reference to being a witness, in the jury box yesterday. Nobody in there but just I and him. He says, 'John we was all friends together and I would like to have you help me out, what you know about it, if you can;' he said to help him out if I could and he would see it was all right. Said, 'Help me out and I will see it is all right with you. I says, 'Henry, I don't care whether it makes you mad or makes Dick mad, I am going to tell the straight.' I

helped to drive the stock over and have never thought about it afterwards until the sheriff subpoenaed me. I didn't keep any memorandum of the exact number. Since that time, I have helped drive cattle several times. There is nothing special to impress the number on my mind, nothing unusual about it. Henry was paying me for this. The road he took had pretty nearly slipped my memory. I cannot have any clear recollection which way he went. I think Henry and I drove the cattle. Dad went along, my pa. Some of the stuff was hauled in a wagon."

E. D. Ritchey, by deposition, testified for plaintiffs as follows:

Have lived in Clark county, Missouri, sixteen or eighteen years. I was acquainted with Samuel Bowden, Sr., in his lifetime, for thirty-seven to forty years. Was in business at Kahoka part of the time, handling stock. I had a conversation with Samuel Bowden, Sr., deceased, in his lifetime, as to the disposition of his property among his children. As to the dates of this conversation, it is hard for me to tell, but I would say, ten or twelve years ago. He and his wife took dinner with me when we lived in town. It might have been longer than that. He owned the farm where he was living and two places north of that, there was three places at the time. My best recollection is, there was eighty acres in the two north places and I think more than that in the south place. He was making a will. I came down town with him and went back and took dinner and I witnessed the will, as I remember it. These two places north of, he told me he was paying them out for the two oldest sons, and the old place was a part of it to go to his younger son and his younger son was to pay the sister some money, and I cannot recollect the exact amount. My recollection was that it was $1000, but I would not be positive. Henry is the youngest son. I can't tell, my recollection is that it was here in this building, don't know

who the other witness was. I didn't read the will, but I heard it read. Bill Robinson had something to do with it, if I remember right. We came down from home after dinner and the papers were drawn and I was a witness to it. I don't remember of any other conversation that I had that I can recollect. During the time that I lived here and was in the stock business, I purchased stock from these farms. I did all the trading with the old gentlemen; still you might say with the family. I paid the old gentleman. I know that I have been on the farm the old gentleman told me he was paying out and was to go to the oldest sons, but I can't remember whether I bought stock on that farm or not.

This was all the evidence introduced on the trial of the cause.

## OPINION.

I. From the foregoing statement of the case it is seen that the two primary questions presented by the pleadings and the evidence, were: First, that Samuel Bowden, the testator, was at the time of making and publishing the will in controversy, of unsound mind; and, second, that the will was not his free act and deed, but was the result of undue influence exerted over his mind by Richard and Samuel Bowden, Jr., sons of the testator, and the proponents of the will.

At the close of all the evidence in the case, the trial court, by a mandatory instruction, compelled the jury to find for the proponents as to the question of mental incapacity of the testator to make a will, and thereby eliminated, and properly so, in my opinion, that question from the case. That ruling of course carries with it all of the incidental or subsidiary questions thereto, and without further ado, we place it and them aside.

We now take up the other primary question presented, namely, the question of undue influence exerted over the mind of the testator by the proponents, and the questions that are incidental thereto.

Attending to the first: Was the evidence introduced at the trial sufficient to support the verdict of the jury setting aside the will?

In approaching this question it should be borne in mind that the burden of proof as to that issue rested upon the proponents. Our reason for so stating is that the proponents admit, and all the witnesses testified, that Richard Bowden, the principal or real proponent, admitted that he lived with his father and mother for several years prior to their deaths; that he attended them constantly and especially during their last illness; and that he had charge of and transacted all, or practically all, of the business of his father, the testator, during those years.

**Will Contest: Burden of Proof.**

That state of facts constitutes the elements of a confidential relation between the father and son, or more properly speaking, is proof of that relationship from which the law draws the inference or presumption that the will was procured through the undue influence of the son and agent, and imposes upon the latter the burden of overcoming that prima-facie case, and of proving that the will was executed by the testator as his own free act and deed.

That doctrine has been so often and uniformly held by this and the various courts of appeals, that we think it would be a useless waste of time and space to cite authorities in support thereof.

That being true, now let us examine the question and see whether or not the proponents have so completely overcome the prima-facie case made by the contestants, and have so completely established the fact that the will as made was the free act and will of the testator, that a court of justice *should say* as a

matter of law that there is nothing whatever tangible
left upon which the verdict of the jury and the judg-
ment of the circuit court can stand; and for those rea-
sons this court should, as a matter of law, so declare,
and hold that there is no evidence preserved in this
record upon which the verdict and judgment can rest.

In approaching this question we should never lose
sight of the fact that equality is equity, and that all of
the proponents and contestants are of the same blood,
flesh and bone of the testator; that he is
the father of them all, and brought them
helpless into the world; that he primarily
owed to each and all of them the same love, mainte-
nance and duty; and that all of them were equally
entitled to his bounty.

Will:
Equality.

So strong did this natural feeling of justice exist
among the ancient Romans, that they enacted laws ab-
solutely preventing parents from disinheriting any of
their children, and a most casual examination of the
Civil Law will clearly show that the courts of that
renowned empire scrupulously enforced those laws.

That same love and natural feeling of justice and
equity ordinarily exists in the heart and mind of every
true man or woman toward his or her offspring, be
he or she Roman or American; and whenever the con-
trary appears, the just mind naturally asks for the
reason thereof.

If we should apply this natural relation and feel-
ing to the parent and children in the case at bar, the
question would naturally suggest itself, did that love
and relation exist between the testator and his chil-
dren?

That it did up to a short time prior to the date
when Henry left the home of his father, there is no
doubt; for all the children and neighbors so testified.
All of them spoke in one accord upon that subject, that
the father was very fond of Mrs. Wendling and Henry;
also the wife of the latter; that he had manifested

his affections for Richard and Samuel by purchasing and clearing up for each of them a farm of eighty acres of land and by giving to them certain live stock; and repeatedly he told the children and neighbors that he intended to give to Henry eighty acres of the home place, and the remaining thirty thereof to his daughter, Mrs. Wendling, with a provision that Henry was to pay Mrs. Wendling a sum of money sufficient in amount to make her thirty acres equal in value to his eighty with the improvements thereon. This was his fixed and settled purpose for years, so testified to by all of the interested parties, as well as by practically all of their neighbors.

That pleasant and equitable feeling and relation existed between the testator and all of his children up to about 1902, when an estranged feeling sprang up between Richard and Henry, and later, for a reason not fully explained, a coolness sprang up between Richard upon the one part, and Mrs. Wendling and her husband on the other part. And almost simultaneously therewith, a feeling of coldness and dislike sprang up on the part of the testator toward his daughter, Mrs. Wendling, and his son Henry; and from that time on he frequently gave vent to that feeling when talking to numerous neighbors of his, and almost invariably when speaking unkindly to or about them he would state in connection therewith some of the unkind remarks, some of the witnesses testified, that Richard said to the testator of and concerning them.

Another strange coincident occurred about this same time, and that was that testator began to change his views as to who were the natural objects of his bounty, or rather the natural objects of his bounty were no longer entitled to an equal distribution of his property.

First one will and then another was made by him, showing a change had come over his mind regarding

252 Mo.—44

an equal and equitable distribution of his estate among his children, and that in proportion as his dislikes grew toward Henry and Mrs. Wendling, his desire to make them equal distributees of his estate diminished and a corresponding desire grew up in his mind in favor of making Richard practically his sole devisee.

At any rate, when the testator reached the age of eighty odd years, confessedly infirm in health and practically helpless on account of heart trouble, rheumatism and defective eyesight, and with a correspondingly decreased mental vigor and will power, he had come, under the care and control of Richard, to thoroughly dislike Henry, and none too well pleased with Mrs. Wendling and her husband; and it seems to me that, in consequence thereof, he changed his fixed determination to make an equal distribution of his property among all his children, and at the same time made up his mind to give practically all of his estate to Richard.

This was all in keeping with the testimony which tended to show that Richard threatened Henry, and said to him, that he would be sorry for not letting him work on the home place with him; that Richard was ever complaining to the testator about the inattention Henry was giving the fences, stables, etc.; that Henry could never have a private conversation with his father because Richard, his wife or daughter was ever present when he was about; and that Henry had driven away some of his father's stock, etc.

The evidence is almost conclusive to the effect that the testator was a man of sound mind and of unusual will power, exceedingly hard to influence or to change in his purpose, when once he had made up his mind to do or not to do a particular thing; and the evidence is practically undisputed that it was the long and well-settled purpose of the testator to give to Henry and Mrs. Wendling the home place as previously stated, in order

to make them equal with Richard and Samuel Bowden, Jr., in the distribution of his estate.

With those two facts practically undisputed, we have searched this record to ascertain what caused this man of strong mind and will, with a fixed purpose, to change his mind, to become unjust in the distribution of his estate, and to turn his love and affections for his son and daughter, Henry and Mrs. Wendling, especially the former, into hatred, and ill will, so strong as to practically accuse Henry, in his will, of having stolen several head of his horses, cattle and hogs.

I challenge anyone to answer this question, from this record, unless it is attributable to the facts previously stated, namely, the covetous desire of Richard to unjustly acquire the birthrights of his brother and sister, and in order to accomplish that purpose he set about to oust Henry from his father's farm, and after accomplishing that, he began to quietly and insidiously pour into the ears of the testator, who was over four score years of age, broken in health and thoroughly dependent upon Richard for everything earthly, including his necessities, comforts and business, the false and slanderous charges previously stated regarding Henry. I say false and slanderous, because there was an abundance of evidence tending to so show, and the jury found that they were such.

So viewing the case from this standpoint, in connection with the confidential relation that existed between the testator and Richard, and the further fact that the latter was the recipient of the bounty which would have gone to Henry and Mrs. Wendling, had not the testator changed his mind regarding the disposition of his estate, we must hold that there was not only a prima-facie case made by the contestants, but that the evidence was ample, independent thereof, to support the verdict of the jury.

The following cases are in harmony with the views before expressed, and in brief hold that a will con-

test is a suit at law, and that when there is substantial evidence introduced bearing upon the question of mental incapacity and undue influence, this court will not reverse the judgment because the jury found against the weight of the evidence. [State ex rel. v. Guinotte, 156 Mo. 513, l. c. 520; Turner v. Anderson, 236 Mo. 523, l. c. 542 to 545; Young v. Ridenbaugh, 67 Mo. 574; Appleby v. Brock, 76 Mo. 314; Harrison v. Lakenan, 189 Mo. 581, l. c. 609; Teckenbrock v. McLaughlin, 209 Mo. 533; Mowry v. Norman, 204 Mo. 173; Mowry v. Norman, 223 Mo. 463; Moore v. McNulty, 164 Mo. l. c. 119; Roberts v. Bartlett, 190 Mo. 680; Harris v. Hays, 53 Mo. 90; Sehr v. Lindemann, 153 Mo. 276, l. c. 288; McFadin v. Catron, 138 Mo. 197; Bradford v. Blossom, 207 Mo. 177.]

We are, therefore, of the opinion that there was ample evidence to support the verdict and that the trial court correctly refused the instruction telling the jury that there was no evidence tending to prove undue influence.

II. The second, third, fourth and fifth errors complained of by counsel for appellants are as follows:

"2nd. Neither courts nor jurors can make wills for men; they ought to be careful in unmaking them.

"3rd. There is no substantial direct or circumstantial evidence in the record showing that Richard Bowden, by undue influence at the time it was written, procured the execution of the instrument read in evidence, and the court should have given the instruction marked 'A' asked by proponents, at the close of all the evidence, directing the jury to find for proponents.

"4th. There is no substantial evidence in the record authorizing the submission to the jury on the part of contestants, that there was such confidential and fiduciary relationship existing between the testator and Richard Bowden, as cast the burden of proof upon the latter to establish there was no undue influence exer-

cised at the time of the execution of the will, and instruction marked 'B' should have been given as asked by proponents.

"5th.  Instructions numbered 5 and 7 casting the burden of proof upon proponent, Richard Bowden, to show that there was no undue influence exerted upon the testator to procure the will, should not have been given because there was no evidence upon which to base them or either of them."

The disposition made of the first assignment of error in paragraph one of the opinion, against appellants, necessarily requires us to also decide all of the foregoing assignments against them, for they involve the same principle of law and are predicated upon the same evidence, and for that reason we will not consider them further.

The sixth complaint is directed against instruction number 2 given by the court, over **Witness:** the objections of appellants, on behalf of **Credibility.** respondents.  That instruction reads as follows:

"6th.  The jury are the sole judges of the credibility of the witnesses and of the weight and value to be given their testimony.  In determining as to the credit you will give to a witness and the weight and value you will attach to a witness's testimony you should take into consideration the character of the witness, the conduct and appearance of the witness upon the stand, the interest of the witness, if any, in the result of the trial, the motives actuating the witness in testifying, the witness's relation to or feeling for or against the defendant, or the alleged injured party, the probability or improbability of the witness's statements, the opportunity the witness had to observe and to be informed as to matters in respect to which such witness gives testimony and the inclination of the witness to speak truthfully or otherwise as to matters within the knowledge of such witness.  All these mat-

ters being taken into account, with all the other facts and circumstances given in evidence, it is your province to give to each witness such credit, and the testimony of each witness such value and weight, as you deem proper. If upon a consideration of all the evidence, you conclude that any witness has shown wilfully falsely as to any material matter involved in the trial, you may reject or treat as untrue the whole or any part of such witness's testimony.''

The specific objections lodged against this instruction are: First, that it is a comment upon the evidence; and, second, that there was no evidence introduced upon which to base that part of the instruction telling the jury, in weighing the evidence, they might consider the character of the witnesses, etc.

Neither of those objections are tenable. As to the first, it is the usual instruction given as a general guide to the jury in weighing the evidence; and as to the second, there was much evidence tending to contradict the testimony of Richard Bowden, which necessarily involved his character.

Witness:
Character.

Counsel for appellants have evidently confused this question with that of reputation. There is a broad distinction between character and reputation. The former is what a person really is, while the latter is what his neighbors think he is. The character of a witness may be established in two ways: First, by the testimony of witnesses who know it; and, second, by his own testimony and conduct upon the witness stand.

The character of a witness is rarely assailed in a direct manner, but is left for the jury to determine from the facts of the case which bespeak the same, while as to the reputation of a witness it can only be brought in question in a direct manner. For this reason it was perfectly proper for the court to have instructed the jury that they might take into consideration the character of the witness and his conduct upon

the witness stand, in weighing his testimony, but such an instruction regarding reputation should never be given, except where it has been directly attacked by the evidence introduced.

These views are fully supported by the following authorities:

Newell on Slander & Libel (2 Ed.), 890, says: "If, however, the plaintiff testifies in his own behalf, he can be cross-examined on all the details of his previous life which affect his character; but, unless such details are material to the issue, the defendant must take the plaintiff's answer, and cannot call evidence to contradict it."

Odgers on Libel & Slander (4 Ed.), 642, is to the same effect.

Evidence not relevant to the issue involved is often competent on collateral matters such as the impeachment of a witness. The plaintiff had testified for himself. In doing so he was subject to all the rules as to cross-examination and impeachment of witnesses. The law in that respect is declared in 1 Greenleaf on Ev. (16 Ed.), sec. 461-b. It is there held that testimony from other witnesses of particular instances of misconduct is an improper mode of discrediting a witness because of the confusion of issues and the waste of time that would be involved and because the witness cannot know what charges may be made and cannot be prepared to expose their falstiy. It is also there stated that for these reasons, the impeaching party (except when proving a conviction of crime) is relegated exclusively to the cross-examination of the witness to be impeached, as the sole mode not open to the above objection of bringing out particular conduct affecting character, and the author then states that the trial court has discretion to set limits to such an examination and to forbid it whenever it seems to be unnecessary or profitless or undesirable, and that such

is the rule now in vogue in the majority of jurisdictions.

2 Wigmore on Ev., sec. 981, sustains the same rule and says: "The reasons already examined (*ante,* sec. 979) appear plainly to have no effect in forbidding the extraction of the facts of misconduct from the witness himself upon cross-examination. There is no danger of confusion of issue because the matter stops with questions and answers; there is no danger of unfair surprise because the impeaching witness is not obliged to be ready with other witnesses to answer the extrinsic testimony of the opponent, for there is none to be answered, and because, so far as the witness himself is concerned, he may not unfairly be expected to be ready to know and to answer as to his own deeds." That doctrine was recognized by this court in 127 Mo. 116, 73 Mo. 242, affirming the opinion of 5 Mo. App. 402. [Miller v. The Journal Co., 246 Mo. 722.] In this case the plaintiff was asked as to the allegations in a divorce petition filed by his wife. The petitions were then introduced to discredit him. *Held,* error; but as there was no objection, judgment would not be reversed on that ground.

In the case of Goins v. City of Moberly, 127 Mo. l. c. 118, the defendant tried to impeach a witness by asking him of his relations with his wife before their marriage. The court refused to compel witness to answer. "The court committed no abuse of its discretion in refusing to compel the witness to answer the question propounded."

"If a witness is asked as to some shameful act for the purpose of discrediting him, those asking the questions are concluded by the answer, the court will not go into the collateral issue which would otherwise be presented. This is the rule and we do not think it was violated." [Muller v. St. Louis Hospital, 5 Mo. App. l. c. 402, affirmed in 127 Mo. 118.]

"It is assigned as error that the circuit court erred in permitting the prosecuting attorney to ask 'X,' a witness for the defendant, on his cross-examination, if he had not in the month of May, 1905, committed a detestable crime. When, the question was asked, the witness himself made no claim of privilege and when the court overruled the defendant's objection, the witness promptly denied the charge. There can be no doubt that under the decisions of this court, the State was concluded by the witness's answer, and, indeed, no effort was made to show anything to the contrary. But the contention here is that notwithstanding the witness promptly denied the disgraceful matter, and notwithstanding the State was concluded by the witness's answer, it is insisted that the very fact of permitting such a question to be asked was erroneous. . . . " It is error to ask the witness if he had been charged with a crime, or whether an information or indictment had been preferred against him, but not if he committed the crime. "There is an obvious distinction between asking one if he had been charged with a crime and asking if he had committed the offense. The point presented by the defendant is not a new one. In Muller v. St. Louis Hospital Assn., 5 Mo. App. l. c. 401, the rule, as announced in Stephen's Digest on the Law of Evidence, 123, as follows: ' "When a witness is cross-examined, he may in addition to the questions hereinbefore referred to, be asked any questions which tend to test his accuracy, veracity or credibility or to shake his credit by injuring his character. He may be compelled to answer any such question, however irrelevant it may be to the facts in issue and however disgraceful the answers may be to himself, except" where the answer might expose him to a criminal charge,' was adopted by that court and on appeal to this court, the opinion of the Court of Appeals was reaffirmed. [73 Mo. 242.] This rule has been followed in the case of

State v. Grant, 79 Mo. 113; State v. Miller, 100 Mo. 606; State v. Hack, 118 Mo. l. c. 99; State v. Taylor, 118 Mo. l. c. 159, 160, and cases there cited. The better doctrine would seem to be that while such questions may be asked a witness on cross-examination, it is a matter largely within the discretion of the court before whom the case is to be tried." [State v. Long, 201 Mo. l. c. 674.]

There is no merit in either of these objections.

III. The seventh error assigned by counsel for appellant is stated in these words:

"The instructions given for contestants are inconsistent with and contradictory of instructions given for proponents."

The instructions given for the appellants and respondents are quite lengthy, covering some fifteen pages of printed matter; and for this reason they are not set out in the statement of the case.

Contradictory Instructions.

Counsel have not called our attention to any inconsistency existing between the instructions given on behalf of appellants and those given for respondents; and after a careful reading of them, we have failed to discover any such inconsistency.

We, therefore, rule this point against appellants.

IV. As previously stated, the assignment of errors consists of sixteen grounds, but counsel for appellants have pressed for our consideration, in their brief and argument, only the seven mentioned, and finding no merit in any of them, we are of the opinion that the judgment of the circuit court should be affirmed; and it is so ordered. All concur.