J. J. MULLER ET AL., Respondents, *v.* ST. LOUIS HOSPITAL ASSOCIATION ET AL., Appellants.

**March 5, 1878.**

1. The question of will or no will is one for the jury, under proper instructions from the court; and where the law of the case is declared with substantial accuracy, the verdict of the jury will not be disturbed by an appellate court.

2. Where a will is made in favor of a religious institution by one *in extremis*, and who died in the hospital of such institution, the instrument being drawn by one acting as chaplain in the hospital, where there is evidence from which want of sound and disposing mind, or the existence of undue influence which destroyed the freedom of the will might fairly be inferred, and where, without apparent reason, the will ignores a natural heir and misdescribes the testator's nearest relatives, a verdict against such a will will not be set aside as against the evidence.

3. In such a case, slight circumstances may furnish sufficient legal warrant for an inference against the will; and if the jury draw such an inference, it is fatal to the will.

4. In a case of a contested will, an instruction which takes from the jury the question of undue influence, or which tells the jury that in case of doubt they must find in favor of the will, is erroneous.

5. In such an action, declarations of the testator contained in a will executed three years before are competent as tending to show the testator's intentions at that time.

6. On cross-examination, a witness may be compelled to answer any questions which tend to test his credibility, or to shake his credit by injuring his character, however irrelevant to the facts in issue, or however disgraceful the answer may be to himself, except where the answer would expose him to a criminal charge.

APPEAL from St. Louis Circuit Court.

*Affirmed.*

HENRY N. HART and A. J. P. GARESCHÉ, for appellants: The extent to which a witness may be interrogated on cross-examination for the purpose of discrediting him. — 1 Greenl. on Ev., secs. 376, 461; *The State* v. *Hamilton*, 55 Mo. 523; *The State* v. *Breden*, 58 Mo. 507; *Seymour* v. *Farrell*, 51 Mo. 97; *United States* v. *Dickinson*, 2 McLean, 329; *United States* v. *Masters*, 4 Cranch C. Ct. 479; *Uhl* v. *The Commonwealth*, 6 Gratt. 706; *Harrington* v. *Lincoln*, 4

Gray, 565 ; *Rogers* v. *Troost,* 51 Mo. 474 ; *Thomas* v. *Stump,* 62 Mo. 277. Former declarations of a testator are inadmissible in evidence, even under the issue of undue influence. — *Hartey* v. *Hill,* 2 Binn. 511 ; *Roe* v. *Taylor,* 45 Ill. 485 ; *Rankin* v. *Rankin,* 61 Mo. 301 ; *Gibson* v. *Gibson,* 24 Mo. 227 ; *Tingley* v. *Cowgill,* 48 Mo. 298.

FINKELNBURG & RASSIEUR, for respondents : The execution of a former will conflicting with provisions of the disputed will was a proper fact to be considered by the jury under the issues made and the circumstances surrounding this case. — *Seale* v. *Chambliss,* 35 Ala. 19 ; *Hughes* v. *Hughes,* 13 Ala. 519 ; Redf. on Wills, 536 ; *Love* v. *Johnson,* 12 Ired. 355 ; *Marvin* v. *Marvin,* 3 Abb. App. Dec. 192 ; *Rollwagen* v. *Marvin,* 5 N. Y. Sup. Ct. 402 ; *s. c.,* 10 N. Y. Sup. Ct. 121 ; *Harris* v. *Hayes,* 53 Mo. 95 ; *Thomas* v. *Stump,* 62 Mo. 275. The questions asked the witness, with a view to discrediting his testimony, were proper. — Greenl. on Ev., secs. 455, 458, 460 ; *Parkhurst* v. *Lowton,* 2 Swans. 216. Gifts, grants, or donations obtained by attorney from client, spiritual adviser from advisee, trustee from *cestui que trust,* parent from child, and guardian from ward, are watched by courts with the most scrutinizing jealousy, and generally held to be presumptively void. — *Garvin's Administrator* v. *Williams,* 44 Mo. 465 ; 50 Mo. 206 ; *Harvey* v. *Sullens,* 46 Mo. 154 ; *Benoist* v. *Murrin,* 58 Mo. 307.

BAKEWELL, J., delivered the opinion of the court.

This is a proceeding, under the statute, to set aside the probate of a will. The jury found that the instrument in question was not the will of the deceased, and from the judgment on this verdict defendants appeal.

The complainants are the brother and the two sisters of deceased, who reside in Switzerland, the birthplace of deceased. Deceased was an unmarried man, with no relatives in this country. In 1873, he visited his brother and sisters in Europe ; and in the summer of 1874, was attacked with

dysentery in St. Louis. After treating himself ineffectu-
ally for some time, he went to the hospital of defendant,
on June 18, 1874, and was received as a private patient,
at $20 per week. On August 1, he was quite low, and
thought himself in danger of death. A Roman Catholic
priest who was at the hospital partly as a patient and
partly in the capacity of chaplain, and who regularly, twice
a day, visited persons of his own religion in the hospital,
that needed his services, had been visiting the deceased as
his spiritual adviser, and was consulted by him as to the
disposition he should make of his property. The priest
testifies : " When he had become rather weak, he was speak-
ing to me about his affairs, telling me that he had about
$4,000, and that he had three sisters living in the county
of St. Gallain, Switzerland ; that he wanted to give them an
equal share, and leave the balance of his property for the
benefit of his soul. He asked me what to do, and I pro-
posed to him to make a will giving to each of his sisters
$1,000, and the balance to the sisters who took care of him,
and for whose care he seemed grateful, and to give $100
for masses to be said for the repose of his soul." The
priest drew up the will according to these directions, and
named himself as executor. After the execution of the will,
the sick man rallied, and, contrary to expectations, survived
for a week. The will was proved on the day of his death.
The executor qualified on the same day, and at once drew,
the available funds out of bank. The testimony of the priest
and of a subscribing witness is, that the will was read, trans-
lated into German, and explained to the deceased before it
was executed. He did not write his name to it, though a
good penman. He was too weak to do so, and, after an
ineffectual effort, made his mark. The attending physician
says : " There was nothing in Müller's mental condition to
attract my attention. His being of sound mind would not
have done so ; but, if it had been abnormal, that would
have done so." The recollection of the doctor does not

seem to be fresh; but he says: "So far as I remember, he seemed to be in a natural state. He had dysentery, and I gave him opiates to obtuse, quiet his sensibilities, dull the feelings. Don't remember, but think I gave him opiates." Question: "To extent to affect his mind?" Answer: "So far as I thought necessary. It does not despoil a man of capability, under ordinary circumstances."

During the week preceding his death, Müller was visited by friends from the city. He said nothing about a will. Two days before he died, he gave to an intimate friend a receipt of the bank for his valuable papers, asking him to keep it for him. The friend says that he expressed dissatisfaction at his treatment, and asked to leave the hospital. The witnesses to the will were a hospital nurse and a patient, whose testimony was not procured for the trial. A will executed by Müller, at Independence, in 1871, and which remained at the time of his death unopened in the hands of a friend, was introduced on the trial. It divided his estate equally between his brother and two sisters. Testimony was introduced to the effect that deceased never went to church in this country, and never said any thing to lead his associates who testified on this point to think he was a Catholic; though he may have been brought up in that religion, for all they know. He was an Odd-Fellow; and there was evidence that a Catholic cannot be admitted to communion whilst remaining a member of a secret society. When he went to the hospital, Müller professed himself a Catholic; and whilst there, received the ministrations of a Catholic priest, at his own request. His friends had free access to him from the first to the last. The sister who attended him, the subscribing witness, and the priest who drew the will, all testify that he was of perfectly sound mind, though very much prostrated, when the will was drawn. There is no testimony whatever directly contradicting this.

The following instructions were given at the instance of plaintiff : —

" 1. The jury are instructed that undue influence operating on the mind of a testator avoids a will; and if the jury are satisfied from the evidence that the instrument in writing, produced by the hospital association, would not have been made by Martin Müller but for undue influence exercised over his mind and will by said association, its members or agents, or by Francis I. Wachter, his spiritual adviser, then the jury should find that said writing was not the will of Martin Müller.

" 2. The jury are instructed that testamentary capacity, or possession of sufficient mind to make his will, is like the capacity to attend to his own affairs, if his bodily health would permit his attention to them; and no man who is incompetent, mentally, to transact his ordinary business can be pronounced capable of making his will. It is also necessary that the testator should have a clear recollection of his property, as well as the natural relations of family and blood ; and if he did not himself write the will, or read it, that the same should have been read and explained to him, so as to be fully understood and comprehended by him.

" 3. Unless the jury believe that the paper produced as the last will of Martin Müller was signed by the deceased, or by some person by his direction and in his presence, and that the same was attested by two witnesses subscribing their names in his presence, then the jury must find the issue against the validity of the will."

At the instance of defendant, the court instructed the jury as follows : —

" 1. On the part of the defendants, the court instructs the jury that the alleged will of Martin Müller, deceased, is not invalid for undue influence, unless the jury shall find from the evidence that the person or persons charged

with procuring the same exerted over him such government and control as effectually destroyed his free and voluntary action, and caused him, while making it, to substitute his or their will and intentions in place of his own.

" 2. The court instructs the jury that a party has the right to dispose of his property by will as he chooses, even to the entire exclusion of those who, but for the will, would be the heirs of his estate ; and the jury are not to consider whether the disposition made by the testator is appropriate or inappropriate, but simply whether the paper, propounded as his will, be or be not his last will and testament.

" 3. The court instructs the jury that it is not unlawful for a person, by honest intercession and persuasion, to procure a will in favor of himself or another person ; neither is it unlawful by fair speeches or kind conduct to influence the disposition in a will ; nor would the will on that account be invalid, unless these influences, conduct, or inducements would, in the belief of the jury, amount to a moral force or coercion incompatible with the idea of free agency.

" 4. If the jury believe from the evidence that the testator had but two sisters, and his will speaks of three, the error does not invalidate the will, if the jury believe that he was, at the time, of sound mind."

The following instructions, asked by defendants, were refused by the court : —

" 1. The court instructs the jury that, if they believe from the evidence that the will in dispute was signed by the testator, by the affixing of his mark thereto, in presence of the two witnesses whose names are as such attached thereto ; that, at the time, he published it as his last will and testament ; that the said witnesses then, in his presence and at his request, subscribed their names as witnesses to said will ; that, at the time, the said testator was of a sound mind ; — then a *prima facie* case has been made out, and the burden devolves upon plaintiffs of establishing that the testator, at the time of the execution of the will, was of

unsound mind, or that the execution was obtained by
improper contrivances or undue influence; and if, by the
contrariety of the evidence for plaintiffs and that for defend-
ants, or that for plaintiffs and that for defendants being so
evenly balanced, that the jury are in doubt for which party
to find, your verdict should be in favor of the validity of
the will.

"2. The jury are further instructed that the testamen-
tary capacity, or possession of sufficient mind to enable
a man to make a will, is like the capacity to attend to his
affairs, if his bodily health permitted his attention to them.
No man who is competent, mentally, to transact his own
business can be pronounced incapable of making a will;
and unless the jury shall believe from the evidence that
Martin Müller, the deceased, at the time of making his
will (August 1st, 1874), was of unsound mind and
incapable of managing his affairs, they must find that
the paper produced is his will; provided always, that he
personally made his mark as his signature to said will,
that the same is genuine, and that the signatures of the
subscribing witnesses are genuine, and that the matters
stated by the witnesses in the certificate of attestation are
true.

"3. The jury are further instructed that there is no evi-
dence before them to sustain the charge in the petition, that
the will of Martin Müller was procured to be executed by
any fraud, restraint, or undue influence."

The instructions given presented the law applicable to
the case fairly to the jury. There was no error in refusing
the instructions refused. Of these, the last took the facts
from the jury, and the second took from them the question
of undue influence. The direction in the third, that in
case of doubt the jury must find for the will, is incorrect.
A jury may find an affirmative fact, without having that
moral certainty which excludes all reasonable doubt.

The question of will or no will was one for the jury,

under the direction of the court; and if the law of the case was declared with substantial accuracy, and there was evidence from which want of sound and disposing mind, or the existence of undue influence which destroyed the freedom of the will, might be fairly inferred, we cannot interfere. With the question of fact, in that case, we have nothing to do. The leading principles on this subject are now well established. The owner of property has a right to dispose of it during his lifetime, and to direct to whom it shall go at his death. So that, if a sound mind and a free will exist, one may deprive those nearest to him in blood, and bound to him by the strongest ties of natural affection, of all benefit of his estate, and leave it entirely to strangers. A father may, if he so choose, disinherit a dutiful child, who has been brought up by him in luxury, and taught to expect an inheritance proportioned to the father's means, and may leave his portion to strangers. In this respect, our system of law differs from that of the civilians. Its wisdom is a question for the theorist, and not for the judge by whom it is administered. But, whilst the absolute right remains, the courts look with suspicion upon any testamentary disposition, made *in extremis*, which seems contrary to what may be called natural equity, or in which the claims of blood are disregarded. And this suspicion is increased when any controlling influence is shown to have been exerted, or is seen to have been in a position to exert itself, in opposition to the canons of descent and distribution. Where one who is to derive benefit from the will has an agency in procuring it, this in itself is a suspicious circumstance; and where such a fact is established, clearer proof of freedom of choice is required. But where full capacity and perfect freedom of choice appear, it matters not how unreasonable the will may be, the testator may dispose of his own, and the courts cannot take away the right, but are bound to respect it. A reasonable will is presumed to be free, but a will entirely unreasonable and unnatural points

directly to the conclusion of insanity or abuse of influence, and very slight evidence will then be sufficient to warrant the conclusion. In proportion to the reasonableness of the will, will be the strength of the presumption of sanity and of freedom from control. Whilst no tribunal can affirm a verdict against a will where capacity, formal execution, and volition appear, no court in Missouri can disturb a. verdict against a will which indicates injustice, in which the nearest relations, with whom the testator is shown to have been on friendly terms, are passed over for strangers, if there is any evidence of undue influence or of want of testamentary capacity. In all cases where there are special grounds for apprehending undue influence, greater watchfulness should be exercised by the courts; and juries very readily infer undue influence, or want of capacity, where the will passes a near relative in favor of a stranger. Where such is the intention of the testator, he runs a great risk of its defeat if he defers its execution until the shadows of death are actually upon him, dimming the brightness of his intellect and weakening the force of his will. A man dying in a hospital, of a disease which necessitates the administration of opiates, may, at the very moment that he is believed to be about to die, and when his hand cannot guide a pen or his eye follow the line, make a will that cannot be disturbed; but if his will disinherit a dependent and dutiful child, or, as in the case at bar, if a childless, unmarried man pass over a brother, without apparent cause, in favor of a. stranger, it invites attack; and the intention of the testator, though formed in health, and long secretly cherished, may be defeated in the contest.

As to undue influence, it may be said that where the will is made by a client in favor of his professional adviser, though not void on that ground alone, where the test is full power of mind and memory, and there are no traces of fraud, yet where the mind is even slightly obscured by disease, fear of approaching death, opiates, or otherwise, it

would be almost impossible to establish the will.   The same
reasons exist, with at least equal force, in regard to a will,
made *in extremis*, in favor of one's spiritual adviser, or of a
religious institution within whose walls the patient lies, and
whose ministers are assisting in à professional capacity at
his bedside.

The application of these principles to the present case is
obvious from the preceding statement of facts, and need not
be particularly drawn out.   It is nothing to the purpose
that the devoted women in charge of the hospital were
ignorant of the character of the will under which the insti-
tution was to take, if it was made under their roof, whilst
the patient was under their care, at the suggestion of his
spiritual adviser of the same faith, written by the chaplain,
and executed in his presence, and in that, exclusively, of
persons connected with the institution.   The intention of all
parties may have been disinterested and praiseworthy to a
high degree, in a religious and moral point of view, and the
will may, nevertheless, be void for legal fraud.   Moreover,
the inferences drawn by the jury, without being illegitimate,
may lead to a conclusion really incorrect; there may be no
fraud in the case, actual or constructive, legal or moral, and
yet slight circumstances in the case may furnish a sufficient
legal warrant for an inference which the jury is not bound
to draw, but which, if drawn by the jury, is fatal to the
will.

A strong circumstance against the will, going to show
that the testator could not have known what he was about
when he gave directions for writing it, or that he was mis-
understood, and that the will was never read or explained
to him, or that, if read, he was not in a condition to under-
stand it, or to know his relations to those about him and
connected with him, is the misdescription of his relatives.
He had, as the evidence abundantly shows, at the time it
was executed, two sisters and a brother, with whom he was
on good terms, and whom he had recently travelled to

Europe to see; or at least, whom he had visited, and with whom he had passed some time, on a recent trip to Europe. Yet the will speaks of three sisters to whom he leaves about three-fourths of his estate, and omits all mention of the brother. This tends to show that the deceased, if he knew what was in the will, did not know what he was about when he signed it.

The facts that the will was made several days before death actually occurred; that the patient rallied and lived a week, during which time he expressed no wish to change it; and the fact that his friends had at all times free access to the dying man, are highly in favor of the will. But against these the jury might set the fact that he never alluded to the will after its execution, and gave directions concerning his property, not to the executor, but to an intimate friend, as if no will existed. This circumstance tended to show that he had forgotten the will as soon as made, or did not know what he was about when he signed it.

Objection was made, on the trial, to the introduction of the former will. But we cannot say that the court committed error in permitting its introduction. It is on the ground of apprehension that the will may not be the act of the testator, that previous declarations in a former will are received. These diminish in importance with the lapse of time, and at last have no value at all. But this will was less than three years old. It spoke of the brother omitted in the present will, and tended to corroborate the view that the intention of the testator, in the normal state of his mind, was to leave his property to his brother and sisters in equal shares.

Respondents insist upon the view that the testator, not being a Catholic, was unlikely to benefit a Catholic charity. We give no force to that argument. We think the evidence tends irresistibly to show that the testator was a Catholic, who put religious thoughts aside while in health, but who

turned to the religion of his early years and sought its consolations on the approach of death. A Catholic who becomes an Odd-Fellow can hardly be said thereby to adopt another religion, however he may, in so doing, violate the precepts and abandon the practice of his own.

On the trial, the priest who drew the will in dispute, and who was named as executor in it, was asked whether he was married in Philadelphia in 1869, and after his ordination. It is objected that the testimony thus elicited was incompetent on two grounds: first, that it did not tend to disparage the witness; and, second, that it was incompetent thus to disparage him. The first ground hardly deserves serious notice. As to the second, the well-established practice of the courts is succinctly stated by the learned and philosophic author of a recent valuable treatise on the law of evidence. Stephen's Dig. Law of Ev., 123. "When a witness is cross-examined, he may, in addition to the questions hereinbefore referred to, be asked any questions which tend to test his accuracy, veracity, or credibility, or to shake his credit by injuring his character. He may be compelled to answer any such question, however irrelevant it may be to the facts in issue, and however disgraceful the answer may be to himself, except" where the answer might expose him to a criminal charge. This is the rule. *Ring* v. *Jamison*, 2 Mo. App. 591. But the extent of cross-examination of this nature is somewhat in the discretion of the court, and must necessarily be so, to prevent abuse. Experienced counsel know well that abuse of the practice injures the party who resorts to it, prejudices his case with the jury, and creates great sympathy for the witness. In the case at bar, we cannot say that the court erred in permitting the question. It is notorious that the Catholic Church prohibits marriage to her priests, and will confer orders upon no one who will not make a vow of celibacy. When a priest of that religion, who does not claim to have conscientiously renounced it, but who still professes it,

admits that he has been married since his ordination, he shows that he has in a grave matter, directly affecting his profession and state of life, deliberately violated what he must regard as a most solemn obligation.  He is thereby discredited to that extent.  And, as *omne majus continet in se minus*, he exposes himself to the imputation that, having deliberately violated in cold blood what must be by him regarded as a most solemn obligation, not by a hasty impulse of passion, but by a formal contract and act, which binds him, under heavy penalties, to an habitual violation of his former obligation and vow, whose force he has not ceased to recognize, he may be regarded perhaps as lightly holding the obligation of an oath.  In the celebrated Tichborne case, cited by Sir J. F. Stephen, a witness was compelled to answer whether, many years before, he had committed adultery with the wife of one of his friends, though this had nothing to do with the case or with his testimony, and the question was asked purely to discredit the witness.  We think that the trial court committed no error in refusing to exclude the question asked in the case at bar.

The same witness was asked, also, for the purpose of discrediting him, as to his disposition of certain moneys received by him as executor.  It is objected that testimony was introduced tending to contradict his answer to this question.  We do not see that the testimony referred to necessarily contradicted the statements of the first witness, nor that it was introduced for that purpose.  If a witness is asked as to some shameful act, for the purpose of discrediting him, those asking the question are concluded by the answer; the court will not go into the collateral issue which would otherwise be presented.  This is the rule, and we do not think it was violated.  The witness said he had not accounted to the administrator *de bonis non*, but was ready to do so, and prepared to pay what he owed the estate.  The former statement was corroborated, and the

latter was not contradicted, by the testimony to which appellants object.

The judgment of the Circuit Court is affirmed. All the judges concur.