James CHISM, Respondent,

v.

W. O. COWAN, Appellant.

No. 52184.

Supreme Court of Missouri,
Division No. 1.

Sept. 11, 1967.

Motion for Rehearing or to Transfer to Court
En Banc Denied Oct. 9, 1967.

John M. Belisle and Morran D. Harris, Osceloa, for appellant.

Foust, Moudy & Jacobson, by Max Foust and Duke W. Ponick, Jr., Kansas City, Mo. Edward J. Murphy, Butler, for respondent.

·HIGGINS, Commissioner.

Action for damages for assault and battery resulting in verdict and judgment for plaintiff for $50,000 actual and $20,000 punitive damages.

Plaintiff's first amended petition charged that defendant "without just cause or provocation, wilfully, wrongfully, and unlawfully assaulted the person of the plaintiff with a deadly weapon, by then and there shooting and wounding plaintiff from ambush by means of an automatic shotgun." Defendant denied the petition and pleaded affirmative defenses that the shooting was an accident and that defendant used only that force which was reason-

able and necessary in the accomplishment of an arrest of plaintiff for an alleged misdemeanor.

The incidents giving rise to this action occurred Sunday, June 7, 1964, on the east side of a pond or lake on a farm owned by defendant in Caplinger Mills, Cedar County, Missouri. Plaintiff and his companion, John Young, parked their car at the Sac River bridge, proceeded on foot through defendant's field and, by their estimates, arrived at the lake with rods, reels, and bait about 7:15 p.m. "It was still daylight," and the weather "was clear." According to defendant, "it was extremely dark, and there was a fog came down over that lake from the south." He first saw a "man's form in the dark standing there" from his point on the west side of a tree "approximately 300 feet back from the lake" where he had gone to watch for persons who might come to fish his lake. "I waited a few minutes to see what was going on, and that form went out of sight and sat down, and in a few minutes I saw two forms stand up, and they were about 10 feet apart. From the distance, what I could see in the dark, I could just see a silhouette, so I started moving down in a sort of a little ravine, more straight west than to the northwest, and I moved down approximately a third of that distance across there."

When plaintiff and John Young arrived at the east side of the lake, "we set down and started to bait up, and we no sooner got, we just was baiting our lines, getting to throw out, when we heard a shot * * *." Plaintiff was then to the right, or north, and Young was to the left, or south, both facing west toward the pond. When plaintiff heard the shot, "John screamed like he was hurt, * * * and then I seen him slump forward, * * * sort of toward the lake, and then he kind of turned his back to the lake as he fell." A second shot then "hit in the grass between us." Plaintiff testified that no warning was given before defendant shot; defendant testified that before he

shot he "hollered at them 'I've got you, and don't you run.' And just as I said 'I've got you, and don't you run' the party on my left made a dive for the lake and I shot him. * * * It was a long distance, probably 200 feet, so I just peppered him real good. And about this time this other form disappeared." This first shot struck John in the back of his head and shoulders.

Plaintiff stated that after the second shot, "I put up my hands and hollered that we give up, and then I stepped, looked around to the northeast and I seen Dr. Cowan running toward us with a shotgun, and I hollered 'We give up, don't shoot.' And he was running at us hollering 'I've got you now, God damn you, I'm going to kill you.' And then I said 'Please don't shoot,' and he said 'Yeah, don't shoot.' He said 'Turn around, you son-of-a-bitch, I'm going to kill you.'" Plaintiff was walking toward defendant during this plea and they were about "10, 15 feet" apart at defendant's command, "turn around." "Just as I turned around like that (to the left), why, I no sooner got turned around than he shot me." Plaintiff did not threaten or attempt to run away from defendant.

John Young saw plaintiff as "he got up and put his hands up and walked toward him (Dr. Cowan)." He heard plaintiff say he gave up, his repeated pleas not to shoot him, and heard defendant state his intention to kill plaintiff. "He (defendant) kept repeating that he caught us and he was going to kill us, he was going to teach us not to fish in there." Young did not see the shot that hit plaintiff but heard the third shot when plaintiff and defendant were about 10 feet apart and saw plaintiff as "he slumped up and bent over and fell on his face." Young then got up and ran to the south. "He shot at me again. * * * I fell down." He was then about 30 feet from defendant. He got up and ran again, and a fifth shot was fired when he was approximately 100 yards from defendant. " * * * on the last shot one (pellet) hit me in the leg."

Defendant's version of these events was that after he fired the first shot the "form" on the right (plaintiff) went north. He fired the second of the five shots in that direction and then plaintiff came up from the water and said he gave up. He left plaintiff standing there and moved southeasterly and south toward John Young. He heard Young coming out of the water but did not see him. "I pulled the gun up to my hip and, in a southwesterly direction, behind him, I fired into the lake. * * * The minute I shot I could tell it didn't hit the water, it hit something, and in the flash of the gun I realized somebody had been hit." He judged this shot to have been from 75 feet away from plaintiff. He shot the fifth time into the air.

Doctor Cowan went from the scene of the shooting to a farmhouse a quarter mile away and called Alfred Oldham, Sheriff of Cedar County. "I told him that two men had been shot down at my lake, and one of them had been shot and I was afraid he was seriously hurt." Sheriff Oldham testified that defendant said "I have killed one boy and I have wounded another." When the sheriff met defendant at the road near the lake sometime later, defendant repeated, "I've killed a boy down here and I have wounded another one. * * * They're going to stop stealing my fish."

Deputy Sheriff Charles Lilly also was present when this meeting took place. John Young then appeared upon being assured that no more shots would be fired. According to Lilly, Young asked defendant why he shot Jim (plaintiff) and him when they were trying to give up. The defendant's reply was that he had warned them to stay out and said he would kill anyone who came on there.

In addition to previously stated testimony from defendant, he testified that he built the lake on this farm which had been in his family for many years. He stocked the lake with fish and began experiencing difficulties with people fishing without his permission. He and Mrs. Cowan would

travel three or four times a week from their home in Greenfield, forty miles away, to protect their property. In the evening of June 7, 1964, he caught two men fishing who ran, one of whom he later learned was John Young. On the evening in question Mrs. Cowan left in the car and defendant stayed at the farm. According to Dr. and Mrs. Cowan there were a number of "No Trespassing" type signs on the premises.

The assemblage at the road following the shooting and call to Sheriff Oldham included an ambulance driver and attendant and the entire group undertook to locate plaintiff, found lying near the pond. He was placed in the ambulance, taken to Cedar County Memorial Hospital in Eldorado Springs, Missouri, where he was admitted in critical condition, examined, and treated surgically by Dr. William C. Sunderwirth.

Doctor Sunderwirth found a badly mutilated area or hole in plaintiff's right flank measuring three inches across. Plaintiff had lost nearly half his normal blood volume and had a gas pattern indicative of developing obstruction which prompted exploratory surgery. The surgery revealed severe internal bleeding and marked concentration of shot in plaintiff's rib cage and liver. There was a hole in the liver in which Dr. Sunderwirth dropped three fingers without reaching the bottom. He put a piece of gelfoam 4″ x 2″ and two other pieces half that size into the liver opening to control the bleeding. Drains were put in plaintiff's side and liver. Shock followed the surgery and plaintiff was then transported to additional medical facilities at Burge Protestant Hospital in Springfield, Missouri. He remained in critical condition until June 11, 1964.

While at Burge Hospital for eighteen days, plaintiff was attended by Dr. James W. Clawson. He received blood transfusions and fluids to restore his normal blood volume. On June 15 Dr. Clawson removed stitches and debrided necrotic tissue from the wound. Blood had to be withdrawn

from the chest cavity by needle on June 16. Plaintiff returned to Cedar County Hospital upon release from Burge and recuperated there an additional six days. He was readmitted for two days February 22, 1965.

Prior to the shooting plaintiff, aged 27, life expectancy 42.32 years, was in good health with no liver or internal injuries or complaints. Dr. Sunderwirth was of the opinion that plaintiff had permanent disability referable to his damaged liver; that his life had been shortened by the shooting and injuries; and that he would have residual pain worsening as he aged. Dr. Clawson testified that damage to the muscles of plaintiff's back and laboratory tests indicative of liver damage were permanent disabilities resulting from the shooting. Dr. Nathan A. Masor examined plaintiff December 15, 1965. His X rays and liver function tests revealed concentration of shot in the liver and along the spine, functional damage to the liver and a problem with the excretory function of the liver. He attributed them and their permanency to the shooting. Dr. Masor also found a defect in the musculature of plaintiff's back where an area of muscle, about 2½ inches, was missing. This, unless repaired, could be subject to future damage even brought about by coughing. He, too, was of the opinion that the shooting shortened plaintiff's life.

Dr. Thomas Ashley examined plaintiff on behalf of defendant June 28, 1965. He found a 2 or 2½ inch depressed scar in plaintiff's right flank and tenderness along the right side of his abdomen down toward the genitals. His X rays revealed metallic foreign bodies resembling shotgun pellets in the right lower chest and right upper abdomen, primarily in the back region of the body. He concluded plaintiff had suffered damage to the nerves to the side of the abdomen. He conducted no liver tests and gave no opinion on permanency of plaintiff's injuries.

Plaintiff missed around four months of work and, upon his return, worked on a part-time basis for awhile. He was discharged from the Army National Guard for medical reasons attributed to the shooting. " * * * lifting, stooping, or even at work, or anything I go to do, it bothers me. * * * When I sneeze it, boy, it really blows out, it just feels like my whole insides is going to come out the hole; and the same with hiccoughs." Hospital and medical expense at the time of trial was $2,012.63, with future surgery recommended by Dr. Masor for repair of the back wound to avoid future injury.

Appellant charges that the court erred in "admitting and receiving irrelevant, immaterial, prejudicial, and inflammatory evidence * * *." This charge goes to Exhibit 3, a 12-gauge, automatic shotgun, full choke, Exhibit 5, a blood-stained T-shirt, Exhibit 12, a black and white photograph of plaintiff while in the hospital, and Exhibits 13 and 14, colored photographs of plaintiff's injury.

Appellant's position is that these admissions violated the rule of keeping "extraneous matters out of the evidence as far as possible," Wimp v. Early, 104 Mo.App. 85 78 S.W. 343, 345; that the T-shirt was so inaccurately identified as to come within the rule that "[h]alf truths and false impressions go often hand in hand, and the law eschews them both," Kelley v. Hudson, Mo.App., 407 S.W.2d 553, 556[2]; that neither the shotgun, the black and white photograph, nor the T-shirt tended to prove or disprove any issues, were not demonstrative evidence, and served only to inflame the jury, and that the colored photographs were gruesome and served only to inflame in violation of the caveat that colored photographs "should be faithful and accurate" and not "tend to exaggerate" in Faught v. Washam, Mo., 329 S.W.2d 588, 599–600[19].

■ The attack on the admission of the T-shirt or undershirt on the ground that it is false evidence is refuted by the record. Exhibit 5 was identified by Sheriff Oldham as "the undershirt that we

taken off of him (plaintiff) out there," and as the shirt that Jim Chism was wearing on the night of the occurrence. It was blood-stained and contained a number of holes, was in the same condition as when found on plaintiff on the bank of the pond, and had been in the sheriff's possession and the possession of his successor, Sheriff Sherman Floyd, from the time he obtained it at the hospital to the time of trial. It thus was admissible, probative, demonstrative evidence of such matters as distance between defendant and plaintiff when the shot struck, the scattering and pattern of the shotgun pellets, plaintiff's position, whether plaintiff's front or back was to the gun, who was the aggressor, violence and type of assault, and location and seriousness of the wound, all of which were disputed. State v. Davis, Mo., 267 S.W. 838, 840[3]; State v. Lewis, Mo., 137 S.W.2d 465, 466[2]; Keen v. St. Louis I. M. & S. R. Co., 129 Mo.App. 301, 108 S.W. 1125, 1126[3]; State v. Tarwater, 293 Mo. 273, 239 S.W. 480, 484[9]; State v. Schmittzehe, Mo., 3 S.W.2d 235, 238; 22A C.J.S. Criminal Law § 713b, p. 969. Appellant emphasizes plaintiff's testimony that he was wearing a hooded sweatshirt, which does not preclude his also wearing the T-shirt, and discrepancy, if any, would be for the jury.

■ Exhibit 3 was identified by Sheriff Oldham as "the gun that we taken off of Doc Cowan." It had been in his or his successor's possession since being taken from defendant at the road near the lake. Defendant stated that it was the gun with which he shot plaintiff. It was admissible, probative, demonstrative evidence on the disputed issue of alleged intentional shotgun assault and wounding of plaintiff by defendant. State v. Wynne, 353 Mo. 276, 182 S.W.2d 294, 299[7]; State v. Ray, Mo., 354 S.W.2d 840, 842[2, 3]; State v. Cooper, Mo., 259 S.W. 434, 436[3].

■ Exhibit 12 was identified by Doctor Sunderwirth and Exhibits 13 and 14 were identified by Doctor Clawson as being fair and accurate representations taken of plaintiff's back while he was in the hospital showing the injury without distortion or exaggeration. They thus complied with the requirements for admissions of color and black and white photographs, and were probative, demonstrative evidence on nature and location of plaintiff's shotgun wound, a disputed trial issue. Faught v. Washam, supra, "does not interdict the use of color photographs or transparencies as such. It gave express approval (which we now reaffirm) to the use of colored photographs under the same limitations and restrictions as are applicable to black and white photographs." Boydston v. Burton, Mo., 379 S.W.2d 536, 542[7]. See also Reed v. Shelly, Mo.App., 378 S.W. 2d 291, 302–303[24–26].

Appellant charges that the court erred "in permitting Plaintiff, on cross-examination of Defendant and Defendant's witnesses and on argument to the jury, to inject false issues into the case calculated to prejudice and inflame the jury against the Defendant."

Appellant recognizes "that great latitude is granted counsel in the cross-examination of witnesses for the purpose of showing interest, prejudice, or feeling, or to determine the truth of the testimony given." His contention is that the cross-examination permitted plaintiff to "lug into the case irrelevant facts and insinuations," Bellovich v. Griese, Mo., 100 S. W.2d 261, 263[3]; Better Roofing Materials Co. v. Sztukouski, Mo.App., 183 S.W.2d 400, 403[7]; and "to get a discreditable matter before the jury for purposes not allowable," Ephland v. Missouri Pac. Ry. Co., 57 Mo.App. 147, 162, 163.

The argument is directed generally to some twenty pages of plaintiff's cross-examination of defendant without specific reference to those matters which are "lugged in" or "not allowable" discrediting defendant. His argument is that by cross-examination questions plaintiff "tried to create in the minds of the jury * * *

that the Defendant was of a vicious nature, that he had shot at other people, that even though he was a doctor he had no regard for human life."

■ There was no attempt by plaintiff to discredit defendant by attempting to prove any such matters or occurrences by independent witnesses, and it has long been the rule in Missouri that on cross-examination "a witness may be asked any questions which tend to test his accuracy, veracity, or credibility, or to shake his credit by injuring his character. He may be compelled to answer any such question, however irrelevant it may be to the facts in issue, and however disgraceful the answer may be to himself, except where the answer might expose him to a criminal charge." Muller v. St. Louis Hospital Ass'n, 73 Mo. 242, affirming 5 Mo.App. 390, 401. See also Asadorian Rug Co. v. Chandeysson, Mo.App., 144 S.W.2d 199, 202[6], and see discussion by Arthur N. Bishop, Jr., Impeachment and Rehabilitation of Witnesses by Character Evidence in Missouri, Cross Examination to Question Character, 20 Mo. Law Review, pp. 149–156. This rule has been applied, for example, to hold it an abuse of discretion not to permit asking a witness on cross-examination if he had not admitted to others that he had burned a schoolhouse, and if he had not asked another to help him load stolen cattle, State v. Crow, 337 Mo. 397, 84 S.W.2d 926, 929[6–8]; that it is within the court's discretion to authorize asking a witness on cross-examination if he had committed an abominable crime, no claim of privilege being made, Wendling v. Bowden, 252 Mo. 647, 161 S.W. 774, 789[4]; and to permit cross-examination as to whether the witness had lived with a woman not his wife, State v. Blocker, Mo., 278 S.W. 1014, 1015–1016[4, 5]. It was clearly within the court's discretion to permit plaintiff's cross-examination of defendant and it is not contended that the court abused such discretion.

■ The foregoing charge also refers to the same items as being error in connection with plaintiff's closing argument. No such contention has previously been presented to the trial court and, accordingly, is not for review. Civil Rule 83.13(a) V.A.M.R., Wolfe v. Harms, Mo., 413 S. W.2d 204, 213[17].

Appellant also complains of admission of Exhibit 37 in evidence during cross-examination of defendant. He claims, without authority, that it did not prove or disprove any issue in the case and was not evidence of the issue upon which offered.

■ The issue was defendant's income in connection with plaintiff's petition for punitive damages. The referable cross-examination was: "Isn't it a fact that you have been averaging, from the practice of medicine and from the operation of your business, from fifty to a hundred thousand dollars per year? A. No, sir." To impeach defendant, Exhibit 37, a certified copy of Dr. W. O. Cowan's petition against Clovis Gibson, et al., constituting the board of Lockwood Memorial Hospital, filed with his authorization by his attorneys in that action, was received in evidence. It reflected that Doctor Cowan claimed a loss of income of $100,000 in a period of approximately two years by reason of his exclusion from the Lockwood Hospital. The use of the petition for purposes of impeachment was proper. Helton v. Huckeba, 365 Mo. 93, 276 S.W.2d 78, 82[4]; Eickmann v. St. Louis Public Service Co., 363 Mo. 651, 253 S.W.2d 122, 125[3].

Appellant charges that the court erred in giving Instruction 1A and refusing Instructions 7 and 8.

■ Instruction 1A directed a verdict for plaintiff if the jury believed:

"First, defendant intentionally shot the plaintiff, and

"Second, defendant thereby caused plaintiff bodily harm."

This is MAI 23.02. The statement demonstrates it to have been supported by sub-

stantial evidence and no affirmative defenses were submitted to be negated. Under such circumstances it was the required instruction "to the exclusion of any other on the same subject." Civil Rule 70.01(b), V.A.M.R.

■ Instruction 7 as offered by defendant was, as stated by appellant, "merely a statement of the law, as found in Section 560.565, RSMo 1959 * * *," which provides: "Every person who shall be convicted of wrongfully and wilfully taking fish from any private pond without the consent of the owner thereof, shall be adjudged guilty of a misdemeanor * * *." A comparison shows the instruction to be an exact recital of the statute, and as such, was simply an abstract statement of the law requiring no finding by the jury. Such instructions tend to mislead and confuse the jury and are properly refused. Endermuehle v. Smith, Mo., 372 S.W.2d 464, 468[7]; Schipper v. Brashear Truck Co., Mo., 132 S.W.2d 993, 995[3, 4], 125 A.L.R. 674.

Appellant's position is that issues were joined on his affirmative defense that he, "even though a private citizen and not an officer, had a right to arrest the Plaintiff for an offense committed in his presence and to use such force as was reasonable and necessary under the circumstances to accomplish the arrest." He tendered his position by refused Instruction 8:

"The Court instructs the Jury that under the laws of the State of Missouri, a private citizen has the right to make an arrest for a crime committed in his presence.

"Therefore, you are instructed that your verdict must be for the defendant, if you find:

"(a) That plaintiff was fishing in defendant's lake;

"(b) That notice was given by the defendant to plaintiff of his intention to arrest him;

"(c) That the plaintiff thereafter attempted to flee to avoid being arrested;

"(d) That the force used by the defendant was reasonable and necessary to prevent an escape by plaintiff;

"(e) That the injuries received by plaintiff were caused by the acts of plaintiff and his companion in attempting to flee to avoid an arrest."

■ A defendant is entitled to submit his affirmative defenses and thus avoid any appearance of a directed verdict for plaintiff, but he must tender their submission by proper instruction. The foregoing instruction is not a proper instruction because, even assuming the opening abstract statement is accurate, the instruction thereafter omits to require a finding that any crime was committed in defendant's presence for which a citizen's arrest could be made. Gray v. Earls, 298 Mo. 116, 250 S.W. 567, 572[1]. Hypothesis (a) requires a finding only that plaintiff was fishing, not that plaintiff wrongfully and wilfully took fish from defendant's pond without his consent as required by the statute, Section 560.565, supra, relied upon by defendant. Under such circumstances, refusal of the instruction was proper "for the omission of (a) constitutive factual element essential to the contemplated favorable determination of the ultimate factual issue instructed upon." State ex rel. Grisham v. Allen, 344 Mo. 66, 124 S.W.2d 1080, 1083[5]; Hatfield v. Thompson, Mo., 252 S.W.2d 534, 544[1]; Banta v. Union Pac. R. Co., 362 Mo. 421, 242 S.W.2d 34, 42[10].

Appellant charges that the verdict "was so grossly excessive as to demonstrate that it was the result of bias and prejudice against the Defendant." Lehnick v. Metropolitan St. Ry. Co., 118 Mo.App. 611, 94 S.W. 996; Buchholz v. Metropolitan Life Ins. Co., 177 Mo.App. 683, 160 S.W. 573; Prospect News Printing Co. v. Swindle, Mo.App., 15 S.W.2d 922; 39 Am.Jur., New Trial, § 121, p. 132.

The nature, extent and permanency of plaintiff's injuries, the attendant pain and suffering, and the special damages have been stated previously and such items are substantial evidence in support of the $50,000 award for actual damages. The intentional shooting of a person in the back with a shotgun at close range as shown by the evidence and found by the jury is the type of act for which punitive damages are provided, and the $20,000 award here is not out of line with the purpose of punitive damages to punish defendant and to deter him and others from like conduct. Appellant's argument goes only to the permanency of plaintiff's injuries and there is substantial evidence favoring plaintiff on that issue. Appellant points to no specific indication of bias or prejudice and review of the record presents no such evidence. Apparently, appellant would have the court infer such from the size of the verdict alone, but this court "may not weigh the evidence and infer prejudice and bias from the size of the verdict." McCaffery v. St. Louis Public Service Co., 363 Mo. 545, 252 S.W.2d 361, 368–369[7, 8].

Finally, appellant argues for new trial "[f]or the cumulative prejudicial effect of the errors discussed," Faught v. Washam, supra, 329 S.W.2d 1.c. 604[30]; but since the trial court committed no error, such theory could have no application.

Judgment affirmed.

HOUSER and WELBORN, CC., concur.

PER CURIAM:

The foregoing opinion by HIGGINS, C., is adopted as the opinion of the court.

HENLEY, P. J., and SEILER and HOLMAN, JJ., concur.

STORCKMAN, J., not sitting when cause was submitted.